1  H. CHRISTIAN L'ORANGE (State Bar No. 71730)
   S. FEY EPLING (State Bar No. 190025)
2  DRINKER BIDDLE & REATH LLP
   50 Fremont Street, 20th Floor
3  San Francisco, California  94105-2235
   Telephone: (415) 591-7500
4  Facsimile: (415) 591-7510
   E-mail: christian.lorange@dbr.com
5  E-mail: fey.epling@dbr.com

6  Attorneys for Defendant
   AXA EQUITABLE LIFE INSURANCE COMPANY
7

**FILED**

MAR 2 6 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

8              UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11  AXA EQUITABLE LIFE INSURANCE          Case No. **08 CV 0569 BTM BLM**
    COMPANY,
12                                        **COMPLAINT FOR DECLARATORY**
                   Plaintiff,             **JUDGMENT AND OTHER RELIEF**
13
                                          **DEMAND FOR JURY TRIAL**
14          v.

15  H. THOMAS MORAN, II, Court-
    Appointed Receiver of LYDIA CAPITAL,
16  LLC and DAWSON & OZANNE, as
    Trustee of Alvin Fischbach Irrevocable
17  Trust,

18                 Defendants.

19       Plaintiff, AXA Equitable Life Insurance Company ("AXA Equitable"), by its

20  attorneys, Drinker Biddle & Reath LLP, hereby files this Complaint for Declaratory

21  Judgment and other relief, and in support thereof, avers as follows:

22       1.    This is an action for Declaratory Judgment under 28 U.S.C. § 2201 and other

23  relief.  AXA Equitable seeks a declaration establishing its rights and obligations pursuant to

24  a policy of life insurance issued to the Alvin Fischbach Irrevocable Trust (the "Trust") on

25  the life of Alvin Fischbach in justifiable reliance upon information provided in the

26  application for that policy.  Upon information and belief, that application was compromised

27  by two material misrepresentations.  Moreover, upon information and belief, the policy in

28  question was procured in order to be sold to disinterested investors, and as such, lacked the

1   required insurable interest. Upon information and belief, Lydia Capital, LLC ("Lydia"), an

2   entity formerly engaged in investing in life insurance policies issued on the lives of

3   strangers, surreptitiously acquired a beneficial interest in the Trust before or very soon after

4   the policy was issued. Lydia is in receivership following the initiation by the United States

5   Securities and Exchange Commission (the "SEC") of an enforcement action alleging Lydia

6   and its principals committed, among other purported illegalities, securities fraud.

## PARTIES

8      2.    Plaintiff AXA Equitable is a life insurance company organized and existing

9   under the laws of the State of New York, with its principal place of business in New York,

10   New York.

11      3.    Defendant H. Thomas Moran, II ("Mr. Moran" or the "Receiver") is a natural

12   person with an address of 521 W. Wilshire Boulevard, Suite 200, Oklahoma City,

13   Oklahoma 73116. By order of court, Mr. Moran was appointed Receiver of Lydia, a limited

14   liability company organized and existing, upon information and belief, under the laws of the

15   State of Delaware, with its principal place of business in Boston, Massachusetts.

16      4.    Upon information and belief, Defendant Dawson & Ozanne (the "Trustee"),

17   as trustee of the Trust, is an entity located in California.

## JURISDICTION AND VENUE

19      5.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §

20   1332(a)(1), insofar as the matter in controversy exceeds the sum of $75,000, exclusive of

21   interest and costs, and there is complete diversity between AXA Equitable and all

22   defendants.

23      6.    In addition, this action may be brought in this Court pursuant to 28 U.S.C. §§

24   754 and 959(a), inasmuch as AXA Equitable brings this action with respect to the

25   Receiver's acts and transactions in carrying on business connected with property which,

26   upon information and belief, is within the Lydia receivership. Furthermore, on March 18,

27   2008, the United States District Court for the District of Massachusetts, the court that

28   appointed Mr. Moran, granted AXA Equitable leave to file an action concerning the validity

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

2

1    of the policy issued to the Trust.

2         7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because a

3    substantial part of the events giving rise to the claim occurred herein.

4          **INVESTOR-ORIGINATED LIFE INSURANCE BACKGROUND**

5         8.     Over the last decade, a secondary market has emerged in which speculative

6    investors have sought to obtain, and in many cases have succeeded in obtaining, a pecuniary

7    interest in life insurance policies. Although there are other varieties of secondary market

8    transactions, in the most problematic scenario, the insured and/or policy owner intend at

9    inception for the policy or a beneficial interest in the entity that owns the policy to be sold

10   and the speculators acquire or agree to acquire an interest in the life insurance policy.

11        9.     These speculators do not acquire an interest in life insurance policies insuring

12   the lives of persons with whom they have a familial relationship, or in whose longevity they

13   possess a legally recognized interest; instead, these speculators purchase policies that insure

14   the lives of strangers – or, in many cases, purchase beneficial interests in insurance trusts or

15   ownership in shell corporations that own those policies – in the expectation that they will

16   profit by the death of the insured.

17        10.     Such arrangements are commonly referred to as IOLI, which stands for

18   "investor-originated life insurance," or STOLI, which stands for "stranger-originated life

19   insurance." (These transactions are referred to as "STOLI" herein.)

20        11.     STOLI transactions often run afoul of state insurable interest laws, which

21   protect the integrity of life insurance by requiring that a policy owner have a cognizable

22   interest in the longevity of the insured at the time the policy is issued.

23        12.     Speculators, who are the true intended owners of STOLI policies, attempt to

24   circumvent these laws by carefully constructing their transactions in order to hide these

25   impermissible investments.

26        13.     The speculators must first find a relatively older and high-net worth individual

27   willing to participate in the investment transactions. Logically, the STOLI investors seek

28   out the highest anticipated rates of return when choosing the life insurance policies on

1   which they will speculate. This means the typical life insurance policy to which speculators

2   gravitate insures the life of an individual aged seventy or older, with a net worth of over one

3   million dollars. These individuals can obtain large value policies, and, actuarially speaking,

4   are expected to have a relatively limited lifespan. For these and other reasons, these

5   individuals are targeted by STOLI speculators.

6       14.    The speculators must also determine the resale value of the policy in the

7   secondary market; this value is based largely upon the life expectancy of the prospective

8   insured. The shorter the expected lifetime of the prospective insured, the more valuable the

9   policy is to those who would gamble on his or her life. Prior to the resale of a policy, the

10   prospective insured often submits to a life expectancy analysis, the results of which are

11   provided to putative investors.

12      15.    Once the speculators locate an individual who meets their investment profile,

13   and, more importantly, will agree to collaborate in the STOLI arrangement, an application is

14   submitted for one or more insurance policies. The speculators typically pay most or all of

15   the prospective insured's costs, including premium payments. Some speculators even agree

16   to pay the prospective insured a fee upon the issuance of the policy.

17      16.    In many cases, the policy application indicates that a third-party entity, such

18   as a trust, a shell corporation or a limited partnership, will be the owner and beneficiary of

19   the life insurance proceeds. This permits the speculators to acquire an interest in this

20   holding entity – and, most importantly, in the death benefit that later will be disbursed by

21   the insurer – without disclosing the fact of their ownership to the insurer.

22      17.    Another way the investors obtain ownership of the policy is to loan the

23   insured the funds to pay the premium for a finite period of time, usually for the two-year

24   contestability period. Once this contestability period has expired, the insured can either

25   repay the loan or assign the policy to the investors, thus completing the transaction. The

26   loan is structured in a way to encourage the insured to assign the policy to the investors by,

27   among other things, loaning the funds at a high interest rate.

28      18.    While there are many other variations, all STOLI programs have one thing in

1    common: their objective is to give investors who have no insurable interest in the life of the

2    insured a stake in the life insurance policy of a complete stranger.

## FACTUAL BACKGROUND

### Issuance of the Policy

5        19.    Sometime prior to December, 2006, Mr. Fischbach was introduced to Eric

6    Hilleboe at a wedding. At that time, or soon thereafter, Mr. Hilleboe informed Mr.

7    Fischbach of a plan by which Mr. Fischbach could apply for a life insurance policy and

8    immediately sell it for a profit. Mr. Hilleboe and Mr. Fischbach decided to apply for an

9    AXA Equitable policy in order to effectuate this plan, but needed a licensed AXA Equitable

10   producer to act as the official producer of record. Mr. Hilleboe subsequently introduced

11   Mr. Fischbach to Kevin Yurkus in order to submit the AXA Equitable application and

12   effectuate the plan, as Mr. Yurkus was then a licensed AXA Equitable producer and friend

13   of Mr. Hilleboe.

14       20.    Consistent with the plan, on December 19, 2007, a formal application (the

15   "Application") was submitted to AXA Equitable for a $1.9 million life insurance policy on

16   the life of Mr. Fischbach, who was then 76 years old, with Kevin Yurkus identified as the

17   agent. A true and correct copy of the Application, with redactions, is attached hereto as

18   Exhibit "A."

19       21.    Although AXA Equitable did not know it at the time, the Application was not

20   submitted for any legitimate life insurance purpose. Rather, consistent with the plan

21   described above, the Application was submitted for the purpose of selling the policy in the

22   secondary life insurance market.

23       22.    On the Application, Mr. Fischbach provided, among other information, his

24   date of birth, social security number, and information concerning his net worth.[1] The

25   Application designated the beneficiary and owner of the prospective policy as the Trust,

---

26

27   [1] The date of birth, social security number, and approximate net worth of Mr. Fischbach were
each indicated on the Application. That information, along with other financial and medical data, has
28   been redacted to protect Mr. Fischbach's confidentiality.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1\3974031\1

COMPLAINT FOR DECLARATORY JUDGMENT

CASE NO. _____

5

1   with Dawson & Ozanne indicated as the trustee.  See Exhibit "A."

2       23.   Mr. Yurkus, Mr. Fischbach and Brendan Ozanne, on behalf of the Trustee,

3   indicated in the Financial Supplement Forming Part of the Application the purpose of

4   applying for insurance was "estate preservation, family protection."  See Exhibit "A."

5       24.   The Application contained a question aimed at discovering whether the

6   intended owner of the policy planned to sell the policy or otherwise use the policy for any

7   secondary market transaction.  The Trustee, as the owner of the policy, answered "No" to

8   this question, which states:

9   > Do you, the owner intend to use or transfer the policy for any
10  > type of pre-death financial settlement, such as viatical
    > settlement, senior settlement, life settlement, or any other
11  > secondary market?

12      25.   The Application also contained a question aimed at determining whether the

13  proposed insured, owner or any other person or entity had agreed to be paid in exchange for

14  Mr. Fischbach and the Trustee obtaining the policy.  Both the Trustee, as owner of the

15  policy, and Mr. Fischbach, as the proposed insured, answered "No" to this question, which

16  states:

17  > Are you, the Owner, Proposed Insured, or any person or
    > entity, being paid (cash, services, etc.) as an inducement to
18  > enter into this transaction?

19      26.   The Application also indicated one other life insurance policy was in effect or

20  being applied for on the life of Mr. Fischbach.  See Exhibit "A."

21      27.   Based upon the Application and the representations contained therein, on

22  January 24, 2007, AXA Equitable issued life insurance policy number 156 232 048 with a

23  total death benefit of $1.9 million on the life of Mr. Fischbach (the "Policy").  A true and

24  correct copy of the Policy, with redactions of personal identifiers, health information and

25  financial information is attached hereto as Exhibit "B."  The Policy was issued with a copy

26  of the Application attached.  See Exhibit "B."

27      28.   Upon receipt of the Policy on February 1, 2007, Brendan Ozanne, by and on

28  behalf of the Trustee, indicated on the delivery receipt "[t]o the best of my (our) knowledge

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

COMPLAINT FOR DECLARATORY JUDGMENT     CASE NO. _____

1  and belief the statements in all parts of the application continue to be true and complete,

2  without material change, as of the time the Policy is delivered and the full initial premium

3  for it is paid." A true and correct copy of the delivery receipt is attached hereto as Exhibit

4  "C."

5        29.    Upon information and belief, within weeks of applying for the Policy, as was

6  intended from before the effective date of coverage, Mr. Fischbach and/or the Trustee

7  completed the sale and/or assignment of a beneficial interest in the Trust to a person or

8  entity in the secondary life insurance market.

9        30.    Upon information and belief, as planned from before the effective date of

10  coverage, a beneficial interest in the Trust, ownership of the Policy, and/or a beneficial

11  interest in the Policy was acquired by Lydia and incorporated into Lydia's portfolio of

12  assets.

13        31.    Upon information and belief, and in direct contradiction to the Application's

14  question inquiring as to whether Mr. Fischbach or the Trustee agreed to purchase the Policy

15  for money, Mr. Fischbach and/or the Trustee received money for their cooperation in the

16  procurement the Policy and the conveyance of the beneficial interest in the Trust to Lydia.

17        32.    On June 25, 2007, Mr. Yurkus requested a verification of coverage from AXA

18  Equitable.

19        **The SEC's Enforcement Action Against Lydia Capital**

20        33.    Shortly after the issuance of the Policy, on or about April 12, 2007, the SEC

21  initiated an enforcement action in the United States District Court for the District of

22  Massachusetts against Lydia and its principals, alleging Lydia carried out a "fraudulent

23  investment scheme" through its sale of "limited partnership interests" in a hedge fund

24  known as the Lydia Capital Alternative Investment Fund (the "Fund"). A true and correct

25  copy of the SEC's Complaint in that action, *SEC v. Lydia Capital, LLC, et al.*, Civ. Action

26  No. 1:07-10712-RGS, is attached hereto as Exhibit "D."

27        34.    Upon information and belief, Lydia's agents included Mr. Yurkus, who

28  procured the Policy solely for the purpose of transferring it to Lydia.

35.    The SEC alleged Lydia, through the sale of the partnership interests in the Fund, failed to disclose "that the Fund's principal underlying assets – i.e., life insurance policies – may be either worthless or virtually worthless." See Exhibit "D" at ¶ 2.

36.    The SEC alleged the life insurance policies may be worthless because the policy applicants "falsely claimed that they had no intention to sell their policies" at the time they applied for insurance. See Exhibit "D" at ¶ 13.

37.    According to the SEC, as a result of these false claims, the "[l]ife insurance companies have a right to rescind the [fraudulent] policies based on false representations in the application." See Exhibit "D" at ¶ 14.

38.    On or about May 1, 2007, the SEC filed an Amended Complaint which further detailed the violations of securities laws allegedly committed by Lydia. A true and correct copy of the SEC's Amended Complaint is attached hereto as Exhibit "E."

### Indicia of a STOLI Transaction

39.    Upon information and belief, the Policy was purchased for the purpose of selling it on the secondary market, as stated in the SEC's Complaint. See "Exhibit D" ¶ 13.

40.    In addition to those allegations set forth by the SEC, two additional grounds exist to support that the Policy was purchased for the purpose of selling it on the secondary market: first, Mr. Fischbach did not know critical aspects of the Policy; and second, Mr. Fischbach stated he purchased the Policy intending to sell it to investors.

41.    Mr. Fischbach lacked knowledge of critical aspects of the Policy. On December 3, 2007, Mr. Fischbach spoke with two AXA Equitable employees regarding the circumstances surrounding the purchase of the Policy. During this conversation, Mr. Fischbach stated he had no knowledge of the name of the Trust, the Trust's beneficiaries or the Trustee. Mr. Fischbach's lack of knowledge in regard to these important aspects of the Policy is even more surprising given Mr. Fischbach indicated in the Application that the Policy was purchased for "family protection" purposes. This lack of knowledge indicates Mr. Fischbach likely had nothing to do with nor was concerned about selecting the Trustee or beneficiary as he planned to sell the Policy immediately upon its issuance.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

8

42.    During the December 3, 2007 conversation, Mr. Fischbach made the following admissions:

- He purchased the Policy with an intent to sell it on the secondary life settlement market.

- He originally contemplated purchasing the Policy for the purpose of "family protection," however, upon learning that the Policy could be sold for cash, he realized selling was a better financial deal.

- Prior to the submission of the Application, Mr. Fischbach was introduced to Eric Hilleboe, a friend of Mr. Yurkus. Mr. Hilleboe introduced the possibility of a secondary market transaction to Mr. Fischbach and also introduced Mr. Fischbach to Mr. Yurkus all prior to the submission of the Application to AXA Equitable.

- Upon meeting Mr. Yurkus, Mr. Fischbach discussed the potential sale of the Policy on the secondary life settlement market.

- Pursuant to the recommendations of Mr. Yurkus and Mr. Hilleboe, soon after purchasing the Policy, Mr. Fischbach completed the sale of the Policy to a hedge fund with the assistance of Mr. Yurkus.

43.    Upon information and belief, Mr. Fischbach's comments, as referenced above, indicate the Policy was purchased in order to sell it on the secondary market.

## COUNT I

## FRAUD

44.    AXA Equitable hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

45.    Upon information and belief, the Trustee made a misrepresentation to AXA Equitable on the Application concerning his intent to use the Policy for a life settlement, viatical or other secondary market transaction. Specifically, the Trustee, as the owner of the Policy, answered "No" to the following question:

Do you, the owner intend to use or transfer the policy for any

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

9

type of pre-death financial settlement, such as viatical
settlement, senior settlement, life settlement, or any other
secondary market?

See Exhibit "A."

46.     Upon information and belief, the Trustee knew of the falsity of his
representation concerning intent to use the Policy for a life settlement, viatical or other
secondary market transaction, or of the possible sale of a beneficial interest in a trust, LLC,
or other entity created, or to be created, on Mr. Fischbach's behalf. Thus, the
misrepresentation of the Trustee in the Application was intentional.

47.     Further, AXA Equitable justifiably relied on the misrepresentation and had it
known of the misrepresentation, it would not have issued the Policy. Thus, the
misrepresentation was material

48.     Upon information and belief, the Trustee and Mr. Fischbach made another
misrepresentation to AXA Equitable on the Application concerning whether Mr. Fischbach
or the Trustee had agreed to apply for the Policy in exchange for payment. Specifically,
they both answered "No" to this question, which states:

Are you, the Owner, Proposed Insured, or any person or
entity, being paid (cash, services, etc.) as an inducement to
enter into this transaction?

See Exhibit "A."

49.     Upon information and belief, the Trustee and Mr. Fischbach knew of the
falsity of this representation concerning their agreement to apply for the Policy in exchange
for payment. Thus, this misrepresentation of the Trustee and Mr. Fischbach in the
Application was intentional.

50.     Further, AXA Equitable justifiably relied on the misrepresentation and had it
known of the misrepresentation, it would not have issued the Policy. Thus, the
misrepresentation was material.

51.     AXA Equitable is entitled to damages based on the fraud perpetrated against
it, including but not limited to the costs associated with issuing and maintaining the Policy,

1    as the Policy was issued in reliance upon the fraudulent misrepresentations detailed above.

2    ## COUNT II

3    ## DECLARATORY JUDGMENT - MATERIAL MISREPRESENTATIONS

4    52.    AXA Equitable hereby incorporates by reference each and every averment of

5    fact contained in the preceding paragraphs as if set forth herein at length.

6    53.    AXA Equitable is entitled to a judicial declaration that, pursuant to CAL. INS.

7    CODE §§ 350, *et seq.*, and 331 *et seq.*, the Policy is void *ab initio*, as it was issued by AXA

8    Equitable in reliance upon two material misrepresentations made by the Policy applicants.

9    ## COUNT III

10   ## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

11   54.    AXA Equitable hereby incorporates by reference each and every averment of

12   fact contained in the preceding paragraphs as if set forth herein at length.

13   55.    Upon information and belief, the Policy was issued to, at the behest of, and/or

14   under the direction of, a party or parties possessing no insurable interest recognized under

15   the law of California.

16   56.    Upon information and belief, Brendan Ozanne, by and on behalf of the

17   Trustee, and/or the beneficiary of the Trust completed the sale and/or assignment of a

18   beneficial interest in the Trust, which was eventually acquired by Lydia.  The purpose of the

19   series of transactions, including the ownership of the Policy by the Trust, was to cloak the

20   agreements whereby Lydia engaged in a gamble upon the life of Mr. Fischbach.

21   57.    AXA Equitable is entitled to a judicial declaration that, pursuant to CAL. INS.

22   CODE §§ 280, 10110, and 10110.1, the Policy is void *ab initio*.

23   ## RELIEF REQUESTED

24   WHEREFORE, AXA Equitable respectfully requests an award of damages based on

25   the fraud perpetrated against it and for the entry of an Order by this Court declaring:

26   A.    Whether the Policy is void *ab initio* due to the fraud of Mr. Fischbach and the

27   Trustee on the application materials and relied upon by AXA Equitable in issuing the

28   Policy;

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1\397403\1    COMPLAINT FOR DECLARATORY JUDGMENT    CASE NO. _____

1        B.    Whether the Policy is void *ab initio* due to the two material

2  misrepresentations by Mr. Fischbach and the Trustee on the application materials and relied

3  upon by AXA Equitable in issuing the Policy;

4        C.    Whether the Policy was unsupported at the time of issuance by any legally

5  cognizable insurable interest under California law and, as such, is void *ab initio*;

6        D.    Whether AXA Equitable may retain some or all of the premiums paid

7  pursuant to the Policy, or, alternatively, may recover its costs and expenses associated with

8  the issuance of the Policy and its aftermath;

9        F.    Whether AXA Equitable is awarded attorneys' fees and costs associated with

10  seeking this judgment; and

11        G.    Whether AXA Equitable is granted such further relief as this Court deems

12  appropriate.

13  Dated: March 25, 2008

14                         H. CHRISTIAN L'ORANGE (SBN 71730)
                       S. FEY EPLING (SBN 190025)

15                         Drinker Biddle & Reath LLP
                       50 Fremont Street, 20th Floor

16                         San Francisco, California  94105-2235
                       Telephone: (415) 591-7500

17                         Facsimile: (415) 591-7510
                       E-mail: christian.lorange@dbr.com

18                         E-mail: fey.epling@dbr.com

19                         Attorneys for Plaintiff
                       AXA EQUITABLE LIFE INSURANCE

20                         COMPANY

21

22                         *Of Counsel*

23                         STEPHEN C. BAKER
                       STEPHEN A. SERFASS
                       DRINKER BIDDLE & REATH LLP

24                         One Logan Square
                       18th & Cherry Streets

25                         Philadelphia, PA  19103-6996
                       Telephone: (215) 988-2700

26

27

28

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

SFI\397403\1

COMPLAINT FOR DECLARATORY JUDGMENT

12

CASE NO. _____

1

### DEMAND FOR JURY TRIAL

2    AXA Equitable Life Insurance Company demands trial by jury of all issues triable

3  by a jury pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 38.1.

4

5  Dated: March 2̲5̲, 2008

6                                        H. CHRISTIAN L'ORANGE (SBN 71730)
                                         S. FEY EPLING (SBN 190025)
7                                        Drinker Biddle & Reath LLP
                                         50 Fremont Street, 20th Floor
8                                        San Francisco, California 94105-2235
                                         Telephone: (415) 591-7500
9                                        Facsimile: (415) 591-7510
                                         E-mail: christian.lorange@dbr.com
10                                       E-mail: fey.epling@dbr.com

11                                       Attorneys for Plaintiff
                                         AXA EQUITABLE LIFE INSURANCE
12                                       COMPANY

13

14                                       *Of Counsel*

15                                       STEPHEN C. BAKER
                                         STEPHEN A. SERFASS
16                                       DRINKER BIDDLE & REATH LLP
                                         One Logan Square
17                                       18th & Cherry Streets
                                         Philadelphia, PA 19103-6996
18                                       Telephone: (215) 988-2700

19

20

21

22

23

24

25

26

27

28

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1\397403\1    COMPLAINT FOR DECLARATORY JUDGMENT                    CASE NO. _____

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance
Part I**
Form No. LIFEAPP-IN
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

Proposed Insured

A. Full Name: First _ALVIN_    M.I. _L_ Last _FISCHRACH_    B. Gender: ☒ Male  ☐ Female

C. Home Address: _____
    No. and Street

    City/Municipality _____ County/Parish _____ State _IN_ Zip + 4 Code _47944_
    (If address is in P.O. Box or not actual residence, proof of residence required.)

D. Home Phone No. _____ Best time to Call: _8:00-5:00_  Best phone no. to be contacted: _____

E. Date of Birth: _____    F. Place of Birth: _____
    (Month/Day/Year)                                   (State/Country)

G. Marital Status: ☐ Single  ☐ Married  ☒ Widowed  ☐ Divorced  ☐ Separated  H. Soc. Sec. No. _____

I. Driver's Lic. No. _____ State: _____

J. U.S. Citizen? ☒ Yes  ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ (# of years in U.S. _____

K. Currently employed? ☐ Yes  ☐ No  ☒ Retired

L. Current Occupation(s): (1) Title _____    (2) Duties _____    (3) How Long? _____
    (If less than 1 year at present occupation, give previous in Remarks.)

M. Employer Name: _____

N. Employer Address: _____
    No.& Street                          City                          State           Zip + 4 Code

O. Annual Earned Income (Income from occupation) $ _____    P. Net Worth $ _____
    If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _ATHENA UL II_    Amount of Insurance $ _____
    (If survivorship policy, complete an application for each Proposed Insured.                    (If face amount is $2 million or larger complete Financial
    If VUL, must also complete VUL Supplement.                                                      Supplement.)
    To select dividend options on EWL or Rides on all Non-VUL Plans
    complete Optional Benefits Supplement.

B. Complete for UL or VUL only  (1) Death Benefit Option  ☒ Option A  ☐ Option B
                                 (2) Planned Periodic Premium $ _____

C. Definition of Life Insurance Test: Complete for AUL II, IL II, COLI '04  ☐ Guideline Premium Test  ☐ Cash Value Accumulation Test

D. Premium Mode: ☒ Annual  ☐ Semi-Annual  ☐ Quarterly  ☐ Monthly
    Or
    System-Matic (Complete S-M form and check applicable box)  ☐ Quarterly (only available for UL and VUL)  ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit No. _____ (3) Unit Register Date _____
    (Specify Allotter name, if other than insured, in Remarks.)

F. Date Policy to save Insured Age?  ☒ Yes  ☐ No

G. 1. Do you, the owner, intend to sell or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or
       for any other secondary market?  ☐ Yes  ☒ No
    2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market
       provider?  ☐ Yes  ☒ No

H. Any other life insurance now in effect or application now pending?  ☒ Yes  ☐ No
    (Give companies, amounts and policy numbers in Remarks.)

I. Will the coverage applied for replace or change any life insurance or annuities?  ☐ Yes  ☐ No   Is this a 1035 Exchange?  ☐ Yes  ☐ No
    If "Yes", complete: (If additional room is needed, please use Remarks Section.)
    Amount $ _25,000_ Company _EQUITABLE_  Issue Year _____ Policy Number _____ ☐ Life  ☐ Group  ☐ Annuity
    Amount $ _____ Company _____  Issue Year _____ Policy Number _____ ☐ Life  ☐ Group  ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option?  ☐ Yes  ☒ No   If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

K. Complete if Proposed Insured is under age 15:  a) State total amount of insurance in force on the life of applicant or child's
                                                     parent, if greater $ _____
                                                   b) Are any other children in the family insured for a lesser amount?  ☐ Yes  ☐ No

If 'Yes' give details _____

AMRGV-2005 IN                          154                          E3173_23  I

**2**

**EXHIBIT A**

**③ BENEFICIARY/OWNER**

A. Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

Beneficiary Full Name
Primary: **ALVIN FISCHBACH**
**IRREVOCABLE TRUST**

Relationship to Insured
**TRUST**

Percentage
**100%**

Contingent:

B. Owner (The Owner of this policy is the insured unless otherwise specified below. Enter name of successor owner in Remarks.)
Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.
If the Owner is the Trust provide the name of the Trust.

Owner's Name: **ALVIN FISCHBACH IRREVOCABLE TRUST**     Social Security # or TIN

Address: Street _____ City **CARLSBAD** State **CA** Zip Code **92008**
(being section will be used as the Owner of this address unless otherwise directed in Remarks Section)

U.S. Citizen? ☐ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

Relationship to Insured **TRUST**     Date of Birth

Name of Trustee **DAWSANT OLANNE**     Date of Trust Agreement **12/13/2006**

*If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States)
then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**④ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

A. Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or
driving under the influence of alcohol or drugs?
(If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.) — Yes ☐ No ☐

B. Any plans to travel or reside outside the United States?
(If "Yes", complete Foreign Residence and Travel Supplement.) — Yes ☐ No ☐

C. Have you been disabled for 2 or more weeks within the last 2 years? — Yes ☐ No ☐

D. In the last year flown other than as a passenger or plan to do so? — Yes ☐ No ☐
(If "Yes", complete Aviation Supplement.)

E. Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning,
hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? — Yes ☐ No ☐
(If "Yes", complete Avocation Supplement.)

F. Ever had an application for life or health insurance that was declined, required an extra premium or other modification? — Yes ☐ No ☐
(If "Yes", state companies and provide full details in Remarks.)

G. In the last 10 years, have you been convicted of, or pled "no contest" to a felony? — Yes ☐ No ☐
(If "Yes" in "Remarks", state full details of offense and penalty, with dates.)

H. Do you currently use any form of tobacco or nicotine product? ☐ Type _____ Avg. Quantity # packs _____ Frequency _____

I. Have you ever used any form of tobacco or nicotine product? ☐ Type _____ Date Ceased _____

**⑤ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

A. Height _____ Weight _____ lbs.

B. Personal Physician Name _____

C. Address _____

D. Date and Reason for Last Visit in the Last 5 Years _____

E. What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

F. In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer,
respiratory or neurological disorder?

G. In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility?
(Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.)

H. In the last 10 years, been:
   1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other
   mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances?
   (If "Yes", complete Substance Usage Supplement.)
   2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any
   self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous?
   (If "Yes", complete Substance Usage Supplement.)

I. In the last 10 years, been:
   Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the
   medical profession?

J.

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | | |
| Mother | | | |
| Sibling | | | |

AMIGV-2005 IN

2

3

**EXHIBIT A**

**G** **DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION**    (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) *Frequency* | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.    (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

_____
_____
_____
_____
_____
_____
_____

**H** **COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application: $ _____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including:

(i)   the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)  the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☐ Yes   ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT.** Each signer of this application agrees that:

(1)  The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid.

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

AM10V-2005 IN                                                                                                    3

**EXHIBIT A**

*3a*

☐ AXA Equitable Life Insurance Company ☐ MONY Life Insurance Company of America

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**

I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**

**TO OBTAIN HEALTH INFORMATION**

I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies): AXA Equitable Life Insurance Company or MONY Life Insurance Company of America, as applicable, and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**

I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**

I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**

I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**

You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**

Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**

I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).

CERTIFICATION INSTRUCTIONS: You must cross out item (II) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City______ [signature]

Signature of Proposed Insured, Applicant, or parent or guardian, if Proposed Insured is a child, Issue Ages 0-14

State *INDIANA* [signature]

Signature of Owner or Applicant if not Proposed Insured

on *12/19/2006* (If corporation, print firm's name and signature of authorized officer.) (If trust, signature of trustee.)

Financial Professional to complete this section:

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued? ☐ Yes ☒ No

(If "yes" give details______)

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.

☐ I have witnessed the signature required on fully completed Part 1 ☒ I have not witnessed the signature required on fully completed Part 1. (Explain below)

*DONE THROUGH MAIL + OVER THE PHONE*

Signature of Licensed Financial Professional/Insurance Broker [signature]

Print Licensed Financial Professional's Name *KEVIN YURKUS*

AMIGV-2005 IN

EXHIBIT A

**Application Part 2 To:** ☒ AXA Equitable Life Insurance Company    *Page 1 / 2*

☐ **AXA Life and Annuity Company**

**PARAMEDICAL**

Reason for submission of this form  ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

1. a. Proposed Insured    First Name    Middle Initial

REDACTED

REDACTED

5

EXHIBIT A



*Page 2*

Application Part 2 To:  ☐ AXA Equitable Life Insurance Company

☐ AXA Life and Annuity Company

**PARAMEDICAL**          Reason for submission of this form:  ☐ New Policy   ☐ Policy Change   ☐ Reinstatement

REDACTED

REDACTED

**EXHIBIT A**

**6**

AXA Equitable Life Insurance
1290 Avenue of the Americas
New York, NY 10104

MONY Life Insurance Company of A
1290 Avenue of the Americas
New York, NY 10104

**Financial Supplement**
Form No. FIN-SUP (2006)

## Financial Supplement Forming Part of the Application for Life Insurance

Name  ALVIN L. FISCHBACH

☒ Proposed Insured
☐ Additional/Joint Insured

**Personal Financial Statement (For Personal Insurance)**

1. Balance Sheet

| Current Assets | Amount | Current Liabilities | Amount |
|---|---|---|---|
| Liquid | $ | Mortgages | $ |
| Other (specify) | $ | Other (specify) | $ |
| Total | $ | Total | $ |
| | | Net Worth | $ |

2. Income

| | Earned Income | Unearned Income | | | | Total |
|---|---|---|---|---|---|---|
| | | Div/Interest | Rental Income | Pension/Soc Sec | Other-specify FARM | |
| Current Year | $ | $ | $ | $ | $ | $ |
| Last Year | $ | $ | $ | $ | $ | $ |

3. How was face amount determined?
State what formula was used (e.g., estimated fair market value, capitalization of earnings, etc.) If none, state none.
   CURRENT NET WORTH GROWING @ 6% FOR 10 YRS. MINUS EXCEPTION

4. Do you expect any changes greater than 15% in income or net worth in the next 12 months?  TO DETERMINE   ☐ YES  ☒ NO
   If "yes", explain   ESTATE TAX
5. Have you filed for bankruptcy in the past 5 years?   LIABILITY   ☐ YES  ☒ NO
   If "yes", chapter _____   Date Open _____   Date Closed _____

**Business Information (For Business Insurance)**

6. Type of business:  ☐ Sole Proprietorship   ☐ Partnership   ☐ Corporation   ☐ Limited Liability Corporation
7. Name of business _____   Nature of business _____
8. How long has business been in operation? _____ years
9. % of business owned _____ %
   Are all members of firm being similarly insured?   ☐ Yes  ☐ No
   a. If "yes", provide details of business coverage issued or applied for on other members (Use Separate Sheet If Necessary)

   | Name | Position/Title | % Owned | Business Insurance in force/applied for |
   |---|---|---|---|
   | | | | |

   b. If "no", explain reason _____

10. Business finances for past 2 years:

| Year | Assets | Liabilities | Retained Earnings | Gross Sales | Net Profit |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |
| | $ | $ | $ | $ | $ |

11. Has the business filed for bankruptcy and/or reorganization in the past 5 years?   ☐ YES  ☐ NO
    If "yes", explain

**Other Information (For Personal and/or Business)**

12. Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)   ☐ Yes  ☒ No

    Check all of the following that apply and complete requested information:
    ☐ Loan _____ (% of premium) Identify Source of Loan _____
       Loan Repayment Schedule _____
       Describe the collateral used _____
    ☐ Cash _____ (% of premium)
    ☐ Existing life insurance policy or contract _____ (% of premium)
    ☐ Existing investments _____ (% of premium) Identify Investment Source _____

13. Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If Yes, describe the inducement)   ☐ Yes  ☒ No

14. Please state the reason you are purchasing this policy (e.g., estate planning, business insurance, etc.)

    ESTATE PRESERVATION, FAMILY PROTECTION

180-6004 (2006)                     Cat. # 134000                     E5810_conc

7

**EXHIBIT A**

References (Personal and/or Business)

| | | |
|---|---|---|
| Attorney: | BRENDAN OZANNE — DAWSON + OZANNE | |
| | Name | Business Address |
| Accountant: | WENDELL LAWSON | |
| | Name | Business Address | Telephone No. |
| Other: | | |
| | Name | Branch | Title of Account |
| | Name | Branch | Title of Account |

Have bankers, attorney and accountant been authorized to release information?    ☑ Yes    ☐ No
If "no", explain

I represent that the statements and answers in this Supplement are true and complete.

_Alan L Pritchard_                                    Date  1/5/2007

Signature of Proposed Insured/Additional Joint Insured

_B. Oz        OZ_

Signature of Owner, if other than Insured

_KW_

Signature of Licensed Financial Professional/Insurance Broker

180-6004 (2006)                    Cat. # 134009                    ES810_edoc

**EXHIBIT** ⎡B⎤

*INSURED PERSON*   ALVIN L FISCHBACH


**AXA EQUITABLE**

*POLICY OWNER*    ALVIN FISCHBACH IRR TR 20061213

*POLICY NUMBER*   156 232 048

# UNIVERSAL LIFE INSURANCE POLICY

**AXA EQUITABLE LIFE INSURANCE COMPANY**
HOME OFFICE: 1290 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK

**We agree** to pay the Insurance Benefit of this policy and to provide its other benefits and rights in accordance with its provisions.

### Flexible Premium Universal Life Insurance Policy

This is a flexible premium universal life insurance policy. You can, within limits:
- make premium payments at any time and in any amount;
- change the Death Benefit Option; and
- reduce the face amount of insurance

These rights and benefits are subject to the terms and conditions of this policy. All requests for policy changes are subject to our approval and may require evidence of insurability.

We put your net premiums into your Policy Account. Your Policy Account will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than 3% per year.

This is a non-participating policy.

**Right to Examine Policy.** You may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this policy with a written request for cancellation to our Administrative Office or to our financial professional by the 10th day after you receive it. If you do this, we will refund the premiums that were paid minus any outstanding loan and accrued loan interest.

**Read Your Policy Carefully.** It is a legal contract between you and AXA Equitable Life Insurance Company.

*Pauline Sherman*

Pauline Sherman, Senior Vice President,
Secretary and Associate General Counsel

*Condron*

Christopher M. Condron
Chairman and Chief Executive Officer

**EXHIBIT B**

04-100IN

10

## Contents

*Policy Information*   3

*Table of Maximum Monthly Charges
for Benefits*   4

*Those Who Benefit from this Policy*   5

*The Insurance Benefit We Pay*   5

*Reducing the Face Amount of the Base
Policy or Changing the Death Benefit
Option*   6

*The Premiums You Pay*   7

*Your Policy Account and How it
Works*   8

*The Cash Surrender Value of this
Policy*   9

*How a Loan Can Be Made*   10

*Our Annual Report to You*   11

*How Benefits are Paid*   11

*Other Important Information*   11

**In this policy:**

**"We," "our," and "us"** mean AXA Equitable Life Insurance Company.

**"You"** and **"your"** mean the owner of this policy at the time an owner's right is exercised.

Unless otherwise stated, all references to interest in this policy are effective annual rates of interest.

Attained age means age on the birthday nearest to the beginning of the current policy year.

**Administrative Office**

The address of our Administrative Office is shown on Page 3. You should send correspondence to that office. Premium payments should be sent to the address listed on your billing notice.

*Copies of the application for this policy and any additional benefit riders are attached to the policy.*

# INTRODUCTION

The premiums you pay, after deductions are made in accordance with the Table of Expense Charges in the Policy Information sectio n, are put into your Policy Account. Amounts in your Policy Account earn interest at rates we declare periodically; these rates will not be less than 3% on an effective annual basis.

If Death Benefit Option A is in effect, the Death Benefit is the base policy face amount. If Death Benefit Option B is in effect, the Death Benefit is the base policy face amount *plus* the amount in your Policy Account. Under either option, the Death Benefit will never be less than a percentage of your Policy Account as stated in the "Death Benefit" provision.

The Insurance Benefit of this policy is payable upon the death of the insured person while the policy is in force.

We make monthly deductions from your Policy Account to cover the cost of the benefits provided by this policy and the cost of any benefits provided by riders to this policy. If you give up this policy for its Net Cash Surrender Value or reduce the base policy face amount, we may deduct a surrender charge from your Policy Account.

This is only a summary of what this policy provides. You should read all of it carefully. Its terms govern your rights and our obligations.

**EXHIBIT B**

04-100IN

Page 2

**11**

## POLICY INFORMATION

| | |
|---|---|
| INSURED PERSON | ALVIN L FISCHBACH |
| POLICY OWNER | ALVIN FISCHBACH IRR TR 20061213 |
| FACE AMOUNT OF BASE POLICY | $1,900,000 |
| DEATH BENEFIT | OPTION A (SEE PAGE 6) |
| POLICY NUMBER | 156 232 048 |
| BENEFICIARY | ALVIN FISCHBACH IRR TR 20061213 |
| REGISTER DATE | OCT 27, 2006 |
| DATE OF ISSUE | JAN 24, 2007 |

ISSUE AGE    75
SEX MALE

RATING CLASS:  STANDARD
NON-TOBACCO USER

A MINIMUM INITIAL PREMIUM PAYMENT OF $10,254.03 IS DUE ON OR BEFORE DELIVERY OF THE POLICY.

THE PLANNED PERIODIC PREMIUM OF $100.00 IS PAYABLE ANNUALLY.

THE ADDITIONAL BENEFIT RIDERS LISTED BELOW, IF ANY, ARE INCLUDED IN THIS POLICY:

THE PLANNED PERIODIC PREMIUMS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE. THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: (1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS; (2) CHANGES IN THE FACE AMOUNT AND THE DEATH BENEFIT OPTIONS; (3) CHANGES IN THE INTEREST RATES CREDITED TO THIS POLICY; (4) CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND (5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.

04-100-3

PAGE 3
(CONTINUED ON NEXT PAGE)

**EXHIBIT B**

12

POLICY INFORMATION CONTINUED–POLICY NUMBER    156 232 048

———    TABLE OF EXPENSE CHARGES    ———

DEDUCTION FROM PREMIUM PAYMENTS:

PREMIUM CHARGE:

WE DEDUCT AN AMOUNT NOT TO EXCEED 15% FROM EACH PREMIUM PAYMENT.

DEDUCTIONS FROM YOUR POLICY ACCOUNT:

ADMINISTRATIVE CHARGE:

FIRST POLICY YEAR: WE DEDUCT $20.00 AT THE BEGINNING OF EACH POLICY MONTH.

SECOND AND SUBSEQUENT POLICY YEARS (BUT NOT BEYOND THE POLICY ANNIVERSARY WHEN THE INSURED PERSON IS ATTAINED AGE 100): WE DEDUCT AN AMOUNT NOT TO EXCEED $10.00 AT THE BEGINNING OF EACH POLICY MONTH.

**EXHIBIT B**

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 232 048

—————— TABLE OF SURRENDER CHARGES ——————
FOR THE INITIAL BASE POLICY FACE AMOUNT

| BEGINNING OF POLICY YEAR | CHARGE | BEGINNING OF POLICY YEAR | CHARGE |
|---|---|---|---|
| 01 | $88,298.19 | 09 | $47,329.32 |
| 02 | $84,252.00 | 10 | $40,489.35 |
| 03 | $80,212.65 | 11 | $33,649.39 |
| 04 | $76,178.24 | 12 | $26,809.43 |
| 05 | $72,147.12 | 13 | $19,967.69 |
| 06 | $67,867.82 | 14 | $13,110.00 |
| 07 | $61,027.86 | 15 | $6,270.04 |
| 08 | $54,186.12 | 16 AND LATER | $0.00 |

A SURRENDER CHARGE WILL BE SUBTRACTED FROM YOUR POLICY ACCOUNT IF THIS POLICY IS GIVEN UP FOR ITS NET CASH SURRENDER VALUE WITHIN THE FIRST FIFTEEN POLICY YEARS. THE SURRENDER CHARGE IN THE FIRST POLICY MONTH OF EACH POLICY YEAR IS SHOWN IN THE TABLE ABOVE. DURING THE FIRST FIVE POLICY YEARS THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES $68,437.74 IN THE TWELFTH MONTH OF POLICY YEAR FIVE. STARTING IN POLICY YEAR SIX, THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES ZERO IN THE TWELFTH MONTH OF POLICY YEAR FIFTEEN.

IF THE BASE POLICY FACE AMOUNT IS REDUCED WITHIN THE FIRST FIFTEEN POLICY YEARS, A PROPORTIONATE SHARE OF THE APPLICABLE SURRENDER CHARGE AT THAT TIME WILL BE DEDUCTED FROM YOUR POLICY ACCOUNT. SEE SURRENDER CHARGES PROVISION FOR A DESCRIPTION OF THE PROPORTIONATE SURRENDER CHARGE.

ADMINISTRATIVE OFFICE:

AXA EQUITABLE LIFE INSURANCE COMPANY

AXA EQUITABLE NATIONAL OPERATIONS CENTER
10840 BALLANTYNE COMMONS PARKWAY
CHARLOTTE, NC 28277
(800) 373-6542

04-100-3                    PAGE 3—CONTINUED

EXHIBIT B

14

POLICY INFORMATION CONTINUED - POLICY NUMBER 156 232 048

———— TABLE OF MAXIMUM MONTHLY CHARGES FOR BENEFITS ————

| BENEFITS | MONTHLY DEDUCTION FROM POLICY ACCOUNT | PERIOD |
|---|---|---|
| BASE POLICY LIFE INSURANCE | MAXIMUM MONTHLY COST OF INSURANCE RATE FOR THE BASE POLICY (SEE PAGE 4 - CONTINUED) TIMES THOUSANDS OF NET AMOUNT AT RISK. NO DEDUCTION IS MADE AFTER AGE 100 OF THE INSURED PERSON. | 25 YEARS |

PAGE 4
(CONTINUED ON NEXT PAGE)

**EXHIBIT B**

**15**

POLICY INFORMATION CONTINUED--POLICY NUMBER   156 232 048

TABLE OF MAXIMUM MONTHLY COST OF INSURANCE RATES
PER $1,000 OF NET AMOUNT AT RISK FOR THE BASE POLICY

| INSURED PERSON'S ATTAINED AGE | RATE |
|---|---|
| 75 | 5.03667 |
| 76 | 5.59000 |
| 77 | 6.17500 |
| 78 | 6.78667 |
| 79 | 7.44000 |
| 80 | 8.16167 |
| 81 | 8.97250 |
| 82 | 9.89750 |
| 83 | 10.95167 |
| 84 | 12.11833 |
| 85 | 13.37417 |
| 86 | 14.69833 |
| 87 | 16.08083 |
| 88 | 17.49667 |
| 89 | 18.96583 |
| 90 | 20.51167 |
| 91 | 22.16500 |
| 92 | 23.98667 |
| 93 | 26.06583 |
| 94 | 28.78417 |
| 95 | 32.81750 |
| 96 | 39.64250 |
| 97 | 53.06583 |
| 98 | 83.33250 |
| 99 | 83.33250 |
| 100 AND OVER | 0.00000 |

**EXHIBIT B**

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 232 048

## TABLE OF PERCENTAGES

| INSURED PERSON'S ATTAINED AGE | PERCENTAGE | INSURED PERSON'S ATTAINED AGE | PERCENTAGE |
|---|---|---|---|
| 40 and under | 250% | 61 | 128% |
| 41 | 243 | 62 | 126 |
| 42 | 236 | 63 | 124 |
| 43 | 229 | 64 | 122 |
| 44 | 222 | 65 | 120 |
| 45 | 215 | 66 | 119 |
| 46 | 209 | 67 | 118 |
| 47 | 203 | 68 | 117 |
| 48 | 197 | 69 | 116 |
| 49 | 191 | 70 | 115 |
| 50 | 185 | 71 | 113 |
| 51 | 178 | 72 | 111 |
| 52 | 171 | 73 | 109 |
| 53 | 164 | 74 | 107 |
| 54 | 157 | 75-90 | 105 |
| 55 | 150 | 91 | 104 |
| 56 | 146 | 92 | 103 |
| 57 | 142 | 93 | 102 |
| 58 | 138 | 94 and above | 101 |
| 59 | 134 | | |
| 60 | 130 | | |

Section 7702 of the Internal Revenue Code of 1986, as amended (i.e., the "Code"), gives a definition of life insurance which limits the amounts that may be paid into a life insurance policy relative to the benefits it provides. Even if this policy states otherwise, at no time will the "future benefits" under this policy be less than an amount such that the "premiums paid" do not exceed the Code's "guideline premium limitations." We may adjust the amount of premium paid to meet these limitations. Also, at no time will the "death benefit" under the policy be less than the "applicable percentage" of the "cash surrender value" of the policy. The above terms are as defined in the Code. In addition, we may take certain actions, described here and elsewhere in the policy, to meet the definitions and limitations in the Code, based on our interpretation of the Code. Please see "Policy Changes -Applicable Tax Law" for more information.

04-100-4GPT                          PAGE 4—CONTINUED                          **EXHIBIT B**

17

## *Those Who Benefit from this Policy*

**Owner.** The owner of this policy is the insured person unless otherwise stated in the application, or later changed.

As the owner, you are entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**Beneficiary.** The beneficiary is as stated in the application, unless later changed. The beneficiary is entitled to the Insurance Benefit of this policy. One or more beneficiaries for the Insurance Benefit can be named in the application. If more than one beneficiary is named, they can be classed as primary or contingent. If two or more persons are named in a class, their shares in the benefit can be stated. The stated shares in the Insurance Benefit will be paid to any primary beneficiaries who survive the insured person. If no primary beneficiaries survive, payment will be made to any surviving contingent beneficiaries. Beneficiaries who survive in the same class will share the Insurance Benefit equally, unless you have made another arrangement with us.

If there is no designated beneficiary living at the death of the insured person, we will pay the Insurance Benefit to the insured person's surviving children in equal shares. If none survive, we will pay the insured person's estate.

**Changing the Owner or Beneficiary.** While the insured person is living, you may change the owner or beneficiary by written notice in a form satisfactory to us. You can get such a form from your financial professional or by writing to us at our Administrative Office. The change will take effect on the date you sign the notice; however, it will not apply to any payment we make or other action we take before we receive the notice.

**Assignment.** You may assign this policy, if we agree; however, we will not be bound by an assignment unless we have received it in writing at our Administrative Office. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of an assignment. An absolute assignment will be considered as a change of ownership to the assignee.

## *The Insurance Benefit We Pay*

We will pay the Insurance Benefit of this policy to the beneficiary upon the death of the insured person no later than 2 months after we receive at our Administrative Office (1) proof that the insured person died while this policy was in force; and (2) all other requirements we deem necessary. The Insurance Benefit includes the following amounts, which we will determine as of the date of death of the insured person:

- the Death Benefit described in the "Death Benefit" provision;

- plus any other benefits then due from riders to this policy;

- minus any policy loan and accrued interest, or liens;

- minus any overdue deductions from your Policy Account if the insured person dies during a grace period.

We will add interest to the resulting amount in accordance with applicable law. We will compute the interest at a rate we determine, but not less than the rate required by any applicable law. If payment is not made within 30 days after the date of death, we will pay interest at no less than the rate specified by Indiana Code 27-1-12-35 or successor regulation. Payment of the Insurance Benefit may also be affected by other provisions of this policy. See the "Other Important Information" section of this policy, where we specify our right to contest the policy, the suicide exclusion, and what happens if age or sex has been misstated. Additional exclusions or limitations (if any) are listed in the Policy Information section.

EXHIBIT B



**Death Benefit.** The Death Benefit of this policy will be determined under either Option A or Option B, whichever you have chosen and is in effect on the date of death of the insured person.

Under Option A, the Death Benefit is the greater of (a) the base policy face amount; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

Under Option B, the Death Benefit is the greater of (a) the base policy face amount *plus* the amount in your Policy Account on the date of death of the insured person; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

The percentages referred to above are the percentages from the "Table of Percentages" shown on Page 4-Continued of this policy for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

**Coverage After Age 100.** If the policy is in force on the policy anniversary when the insured person reaches age 100, it will remain in force subject to the policy loan provision. However, no premium payments, partial withdrawals, changes in face amount or changes in Death Benefit Option will be permitted after age 100 of the insured person; policy loans and loan repayments may continue to be made, subject to our normal rules as stated in other provisions of the policy pertaining to these items. No deductions for cost of insurance or administrative charges will be made after age 100 of the insured person.

## *Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option*

You may reduce the face amount of the base policy or change the death benefit option by written request to us at our Administrative Office, subject to the following conditions:

1. After the second policy year while this policy is in force, you may ask us to reduce the base policy face amount but not to less than $50,000. Any such reduction in the face amount may not be less than $10,000. If you reduce the base policy face amount before the end of the twentieth policy year, we will deduct a proportionate amount of any applicable surrender charge from your Policy Account.

2. After the second policy year while this policy is in force, you can change your death benefit option. Any requested change to death benefit Option B must be made while the insured person is not more than attained age 90. If you ask us to change from Option A to Option B, we will decrease the base policy face amount by the amount in your Policy Account on the date the change takes effect. However, we will decline to make such change if it would reduce the base policy face amount to less than $50,000. If you ask us to change from Option B to Option A, we will increase the base policy face amount by the amount in your Policy Account on the date the change takes effect. Such decreases and increases in the base policy face amount are made so that the death benefit remains the same on the date the change takes effect.

3. The change will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request.

4. We reserve the right to decline to make any change that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

5. You may ask for a change by completing an application for change, which you can get from your financial professional or by writing to us at our Administrative Office. A copy of your application for change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become a part of this policy. We may require you to return this policy to our Administrative Office to make a policy change.

# *The Premiums You Pay*

The minimum initial premium payment shown in the Policy Information section is due on or before delivery of this policy. No insurance will take effect before a premium at least equal to the minimum initial premium is paid. Other premiums may be paid at our Administrative Office at any time prior to attained age 100 of the insured person while this policy is in force. We will furnish you with a premium receipt, signed by one of our officers, upon request.

We will send premium notices to you for the planned periodic premium shown in the Policy Information section. You may skip planned periodic premium payments. However, this may adversely affect the duration of the Death Benefit and your policy's values. We will assume that any payment you make to us is a premium payment, unless you tell us in writing that it is a loan repayment.

If you stop paying premiums, insurance coverage will continue for as long as the Net Policy Account Value is sufficient to cover the monthly deductions described in the "Monthly Deductions" provision, with a further extension of coverage as described in the "Grace Period" provision.

**Limits.** Each premium payment after the initial one must be at least $100. We may increase this minimum limit 90 days after we send you written notice of such increase. We reserve the right to limit the amount of any premium payments you may make if they would immediately result in more than a dollar for dollar increase in the Death Benefit (which would happen if the Death Benefit is determined as a percentage of the Policy Account, as described in the "Death Benefit" provision), unless you provide satisfactory evidence of insurability of the insured person.

We also reserve the right not to accept premium payments or to return excess amounts that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

**Grace Period.** At the beginning of each policy month, we compare the Net Policy Account Value (this is equal to the amount in your Policy Account minus any policy loan and accrued loan interest) to the total monthly deductions described in the "Monthly Deductions" provision. If the Net Policy Account Value is sufficient to cover the total monthly deductions, this policy is not in default.

If the Net Policy Account Value at the beginning of any policy month is not sufficient to cover the total monthly deductions, the policy is in default as of the first day of such policy month.

If the policy is in default, we will send you and any assignee on our records at last known addresses written notice stating that a grace period of 61 days has begun starting with the date the notice is mailed. The notice will also state the amount of payment that is due.

The payment required will not be more than an amount sufficient to increase the Net Policy Account Value to cover all monthly deductions for 3 months, calculated assuming no interest was credited to the Policy Account and no policy changes were made.

If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and retain any amount in your Policy Account; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

If we receive the requested amount before the end of the grace period, but the Net Policy Account Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61 day grace period has begun and request an additional payment.

If the insured person dies during a grace period, we will pay the Insurance Benefit as described on Page 5.

**EXHIBIT B**

**Restoring Your Policy Benefits.** If this policy has ended without value and was not given up for its Net Cash Surrender Value, you may restore policy benefits while the insured person is alive. In order to restore benefits, you must:

1.  Ask for restoration of policy benefits within 5 years from the end of the grace period; and

2.  Provide evidence of insurability satisfactory to us; and

3.  Make a required payment. The required payment will not be more than an amount sufficient to cover (i) total monthly deductions for 3 months, calculated from the effective date of restoration; and (ii) the premium charge. We will determine the amount of this required payment as if no interest was credited to your Policy Account.

We must receive the required payment while the insured person is alive. We will deduct the premium charge from the required payment. The policy account on the date of restoration will be equal to the balance of the required payment.

The effective date of the restoration of policy benefits will be the beginning of the policy month which coincides with or next follows the date we approve your request. We will start to make monthly charges again as of the effective date of restoration. The schedule of surrender charges that was applicable on the date of default will also be applicable to the restored policy.

We reserve the right to decline to restore this policy if in our opinion it would cause this policy to fail to qualify as life insurance under applicable tax law.

## *Your Policy Account and How it Works*

**Premium Payments.** When we receive your premium payments, we subtract the premium charge shown in the table in the "Policy Information" section and any overdue monthly deductions. We put the balance (the net premium) into your Policy Account as of the date we receive the premium payment at our Administrative Office and before any deductions from your Policy Account due on that date are made. However, we will put the initial net premium payment into your Policy Account as of the Register Date if it is later than the date of receipt. No premiums will be applied to your Policy Account until the minimum initial premium payment, as shown in the "Policy Information" section, is received at our Administrative Office.

We credit interest to your Policy Account at effective annual rates we determine periodically. We make deductions from your Policy Account as described in the "Monthly Deductions" provision. We also subtract from your Policy Account any partial Net Cash Surrender Value withdrawals you ask for; more details are given in the Cash Surrender Value section of this policy.

**Monthly Deductions.** At the beginning of each policy month we make a deduction from your Policy Account to cover the charges described below. If you do not submit the full minimum initial premium with your application, and the minimum initial premium is paid upon delivery, your monthly charges commence as of the Register Date. Such deduction for any policy month is the sum of the following amounts determined as of the beginning of that month:

*   the monthly administrative charge;

*   the monthly cost of insurance for the insured person; and

*   the monthly cost of any benefits provided by riders to this policy.

The monthly cost of insurance is the sum of (a) our current monthly cost of insurance rate times the net amount at risk at the beginning of the policy month divided by $1,000; *plus* (b) any flat extra charge shown in the "Policy Information" section. The net amount at risk at any time is the Death Benefit (calculated as of that time) minus the amount in your Policy Account at that time.

**EXHIBIT B**

04-100-7                                                          Page 8  **21**

We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision. They will never be more than those shown in the Table of Maximum Monthly Cost of Insurance Rates Per $1000 of Net Amount at Risk for the Base Policy on Page 4-Continued.

No monthly deductions are made after age 100 of the insured person.

**Other Deductions.** We also make the following other deductions from your Policy Account as they occur:

• We deduct a surrender charge if, before the end of the fifteenth policy year, you give up this policy for its Net Cash Surrender Value or you reduce the base policy face amount.

**How We Add Interest.** We will credit the amount in your Policy Account with interest at rates we determine. We will determine such interest rates periodically in advance for unloaned and loaned amounts. The rates may be different for unloaned and loaned amounts. Any change in the interest rates we determine will be as described in the "Changes in Policy Cost Factors" provision. Such interest rates will not be less than 3% per year. Interest accrues and is credited on unloaned amounts in your Policy Account daily. However, we will credit interest on the initial net premium from the Register Date if it is later than the date of receipt provided the initial premium is at least equal to the minimum initial premium shown on Page 3 of the policy.

We credit interest on the loaned portion of your Policy Account daily. The interest rate we credit to the loaned portion of your Policy Account will be at an annual rate up to 2% less than the loan interest rate we charge. However, we reserve the right to credit a lower rate than this if in the future tax laws change such that our taxes on policy loans or policy loan interest are increased. In no event will we credit less than 3% per year.

On each policy anniversary and at any time you repay all of a policy loan, we will transfer the interest that has been credited to the loaned portion of your Policy Account to the unloaned portion of your Policy Account.

## The Cash Surrender Value of this Policy

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any applicable surrender charge. The Cash Surrender Value within 30 days after the policy anniversary will not be less than on such anniversary after the deduction of monthly charges then due, assuming there are no partial withdrawals or other policy changes during that time.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request for it and this policy to our Administrative Office. Your written request for cancellation or surrender must include the following:

1. A statement that makes it clear that you intend to surrender the contract;
2. The policy number of the policy to be surrendered;
3. The name of the insured person and your name (if other than the insured person) and address where proceeds should be mailed;
4. Your signature and, if required by the policy or by a legally binding document of which we have an actual notice, the signature of a collateral assignee or other person having an interest in the policy through the legally binding document.

If this policy has a Cash Surrender Value and is being given up for its Net Cash Surrender Value, a completed withholding authorization must also be included with your written request. If this form is not provided to us with your written request for surrender, we will withhold income tax on the taxable portion of your distribution at the mandated federal and state tax rates. We will compute the Net Cash Surrender Value as of the date we receive your request for it and this policy at our Administrative Office. If the policy has been lost, stolen or destroyed, you must include a statement in the written request that the policy was lost, stolen or destroyed with an approximate date of when the policy was lost, stolen or destroyed. All insurance coverage under this policy ends on the date we receive your written request.

**Surrender Charges.** If you give up this policy for its Net Cash Surrender Value before the end of the fifteenth policy year, we will subtract a surrender charge from your Policy Account. A table of surrender charges for the initial base policy face amount is in the "Policy Information" section.

04-100-91N

Page 9  22

**EXHIBIT B**

If the base policy face amount is reduced before the end of the fifteenth policy year, we will also deduct a proportionate amount of any applicable surrender charge from your Policy Account. We will send you a new Policy Information section in the event of a reduction in the base policy face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

We have filed a detailed statement of the method of computing surrender charges with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**Partial Net Cash Surrender Value Withdrawal.** After the first policy year, and while the insured person is living, you may ask for a partial Net Cash Surrender Value withdrawal by written request to our Administrative Office. Your request will be subject to our approval based on our rules in effect when we receive your request, and to the minimum withdrawal amount of $500.00. We have the right to decline a request for a partial Net Cash Surrender Value withdrawal if this would cause the policy to fail to qualify as life insurance under applicable tax law, as interpreted by us. We will decline a request for a partial Net Cash Surrender Value withdrawal if this would cause a decrease in the base policy face amount to less than $50,000. A partial withdrawal will result in a reduction in the Cash Surrender Value and in your Policy Account equal to the amount withdrawn as well as a reduction in your Death Benefit. If the Death Benefit is Option A, the withdrawal may also result in a decrease in the face amount; there will be no proportionate surrender charge due to such a decrease.

Such withdrawal and resulting reduction in the Death Benefit, in the Cash Surrender Value and in your Policy Account will take effect on the date we receive your written request at our Administrative Office. We will send you a new Policy Information section if a withdrawal results in a reduction in the face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

## How a Loan Can Be Made

**Policy Loans.** You can take a loan on this policy while it has a loan value. This policy will be the only security for the loan. Any amount on loan is part of your Policy Account. We refer to this as the loaned portion of your Policy Account.

**Carry Over Loans.** If this policy was issued based, in whole or part, upon an exchange of another life insurance policy, any transferred existing loan from the exchanged policy as approved by us will be put into the loaned portion of your Policy Account. If a refund is made under the "Right to Examine Policy" provision, we will subtract any policy loan and accrued loan interest from that refund.

**Loan Value.** The loan value on any date is the Cash Surrender Value on that date discounted at the loan interest rate we charge to the next policy anniversary. The amount of any new loan you take may not be more than the loan value, less any existing loan and accrued loan interest. If you request an increase to an existing loan, the additional amount requested will be added to the amount of the existing loan and accrued loan interest.

**Loan Interest.** Interest on a loan accrues daily at an adjustable loan interest rate. We will determine the rate at the beginning of each policy year, subject to the following paragraphs. It will apply to any new or outstanding loan under the policy during the policy year next following the date of determination.

The maximum loan interest rate for a policy year shall be the greater of (1) the "Published Monthly Average," as defined below, for the calendar month that ends two months before the date of determination or (2) 4%. "Published Monthly Average" means the Moody's Corporate Bond Yield Average - Monthly Average Corporates published by Moody's Investors Service, Inc., or any successor thereto. If such averages are no longer published, we will use such other averages as may be established by regulation by the insurance supervisory official of the jurisdiction in which this policy is delivered. In no event will the interest rate for a policy year be greater than 15%. We reserve the right to establish a rate lower than the maximum.

No change in the rate shall be less than $\frac{1}{2}$ of 1% per year. We may increase the rate whenever the maximum rate as determined by clause (1) of the preceding paragraph exceeds the rate being charged by $\frac{1}{2}$ of 1% or more. We will reduce the rate to or below the maximum rate as determined by clause (1) of the preceding paragraph if such maximum is lower than the rate being charged by $\frac{1}{2}$ of 1% or more.

We will notify you of the initial loan interest rate when you take out a loan. We will also give you advance written notice of any increase in the interest rate of any outstanding loan.

Loan interest is due on each policy anniversary. If the interest is not paid when due, it will be added to your outstanding loan and bear interest at the loan rate then in effect.

**EXHIBIT B**

**Loan Repayment.** You may repay all or part of a policy loan at any time while the insured person is alive and this policy is in force.

Failure to repay a policy loan or to pay loan interest will not terminate this policy unless at the beginning of a policy month the Net Policy Account Value is less than the total monthly deduction then due. In that case, the "Grace Period" provision will apply.

A policy loan will have a permanent effect on your benefits under this policy even if it is repaid.

## Our Annual Report to You

For each policy year we will send you without charge a report for this policy that shows the current Death Benefit, the value of your Policy Account, the Cash Surrender Value and any policy loan with the current loan interest rate. It will also show the premiums paid and any other information as may be required by the insurance supervisory official of the jurisdiction in which this policy is delivered.

## How Benefits Are Paid

The Insurance Benefit or your Net Cash Surrender Value withdrawals are paid immediately in one sum. Amounts paid will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

## Other Important Information

**Your Contract with Us.** This policy is issued in consideration of payment of a premium at least equal to the minimum initial premium payment shown in the "Policy Information" section. This policy, any riders or endorsements, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract. The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations.

Only our Chairman of the Board, our President or one of our Vice Presidents can modify this contract or waive any of our rights or requirements under it. The person making these changes must put them in writing and sign them.

**Policy Changes — Applicable Tax Law.** For you and the beneficiary to receive the tax treatment accorded to life insurance under Federal law, this policy must qualify initially and continue to qualify as life insurance under the Code or successor law. Therefore, we have reserved earlier in this policy the right to decline to accept premium payments, to decline to change Death Benefit Options, to decline to change the face amount, or to decline to make partial withdrawals that, in our opinion, would cause this policy to fail to qualify as life insurance under applicable tax law. Further, we reserve the right to make changes in this policy or its riders (for example, in the percentages in the "Death Benefit" provision) or to require additional premium payments, or to make distributions from this policy or to change the face amount to the extent we deem it necessary to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected. You will be given advance written notice of such changes.

**Changes in Policy Cost Factors.** Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**When the Policy is Incontestable.** We have the right to contest the validity of this policy based on material misstatements made in the initial application for this policy. However, we will not contest the validity of this policy after it has been in effect during the lifetime of the insured person for two years from the earlier of the Register Date or date of issue shown in the Policy Information section.

EXHIBIT B

We also have the right to contest the validity of any policy change or restoration based on material misstatements made in any application for that change or restoration. We will not contest any policy change that requires evidence of insurability, or any restoration of this policy, after the change or restoration has been in effect for two years during the lifetime of the insured person.

No statement shall be used to contest a claim unless contained in an application.

All statements made in an application are representations and not warranties.

See any additional benefit riders for modifications of this provision that apply to them.

**What if Age or Sex has Been Misstated?** If the insured person's age or sex has been misstated on any application, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at the correct age and sex.

**How the Suicide Exclusion Affects Benefits.** If the insured person commits suicide (while sane or insane) within two years after the earlier of the Register Date or the date of issue shown in the Policy Information section, our liability will be limited to the payment of a single sum. This sum will be equal to the premiums paid, minus any loan and accrued loan interest and minus any partial withdrawal of the Net Cash Surrender Value. If the insured person commits suicide (while sane or insane) within two years after the effective date of a change that you asked for that increases the Death Benefit, then our liability as to the increase in amount will be limited to the payment of a single sum equal to the monthly cost of insurance deductions made for such increase.

**How We Measure Policy Periods and Anniversaries.** We measure policy years, policy months, and policy anniversaries from the Register Date shown in the Policy Information section. Each policy month begins on the same day in each calendar month as the day of the month in the Register Date.

**When We May Defer Payment.** We may defer payment of any Net Cash Surrender Value withdrawal or loan amount (except when used to pay premiums to us) for up to six months after we receive a request for it. We will allow interest, at a rate of at least 3% per year, on any Net Cash Surrender Value payment that we defer for 30 days or more.

**The Basis We Use for Computation.** We provide Cash Surrender Values that are at least equal to those required by law. If required to do so, we have filed with the insurance supervisory official of the jurisdiction in which this policy is delivered a detailed statement of our method of computing such values. We compute reserves under this policy by the Commissioners' Reserve Valuation Method.

We use the 1980 Commissioners' Standard Ordinary Male or Female Mortality Tables at attained ages 0-17, and the 1980 Commissioners' Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables at attained ages 18 and over, as the basis for determining maximum insurance costs and minimum cash surrender values. We take account of the sex, attained age, and class of risk of the insured person. For attained ages 18 and over, we also take account of the tobacco user status of the insured person. We use a minimum effective annual interest rate of 3%.

However, for all ages, if this policy is issued in a substandard rating class, guaranteed maximum cost of insurance charges and minimum cash surrender values are based on the applicable mortality table as stated above with a factor, reflecting actual rating class, applied.

For policies issued at attained ages 0-17, an insured person's cost of insurance rate is not based on that person's status as a tobacco user or non-tobacco user. Effective with the policy anniversary when that insured person reaches attained age 18, non-tobacco user cost of insurance rates will be charged for that person. For policies issued at attained ages 18 or over, an insured person's cost of insurance rate takes account of that person's status as a tobacco user or non-tobacco user.

**Change from Tobacco User Rates to Non-Tobacco User Rates.** Any insured person attained age 18 or over being charged tobacco user rates may be eligible for non-tobacco user rates. The change, if approved, may result in lower future cost of insurance rates beginning on the effective date of change to non-tobacco user rates.

Upon request made to our Administrative Office, we will provide forms and instructions as to how you may apply for non-tobacco user rates. The change will be based upon our general underwriting rules in effect at the time of application, and may include criteria other than tobacco use status as well as a definition of tobacco use different from that applicable at the time this policy was issued.

04-100-11IN                                                                 Page 12 25

**EXHIBIT B**

The change to non-tobacco user rates, if approved, will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request. A copy of your application for the change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become part of this policy. We may require you to return this policy to our Administrative Office to make the change. This change may have adverse tax consequences.

The change to non-tobacco rates will be contestable; however, we will not contest the change after it has been in effect for two years during the lifetime of the insured person. In the event of a successful contest, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at tobacco user rates.

**Policy Illustrations.** Upon request we will give you an illustration of the potential future benefits under this policy, based upon both guaranteed and current cost factor assumptions.

**Policy Changes.** You may add additional benefit riders or make other changes, subject to our rules at the time of change.

**Conversion Privilege.** You may, with the written consent of the insured person, request that we convert this policy to a variable life insurance policy we are then offering. You may request this at any time after the first policy year but not later than the fifth policy year after the register date of this policy. The new policy will be subject to its own issue age and face amount limits. If the insured person is less than attained age 65 at the time of the request, we will not require any evidence of insurability except as specifically noted below. If the insured person is attained age 65 or over at the time of the request, we will require evidence of insurability satisfactory to us. In all cases, this request is also subject to all of the following conditions:

1. This policy must be in force on the date of conversion. The insured person may not then be disabled under the terms of any disability waiver rider in effect under this policy.

2. The new policy will have a face amount of insurance equal to the face amount of insurance under this policy on the date of conversion. In order for the new policy to qualify as life insurance under the Internal Revenue Code or successor legislation, as interpreted by us, it may be necessary to increase the face amount of the new policy. If so, any increase in the face amount of the new policy to assure that the new policy meets the definition of life insurance will be subject to evidence of insurability satisfactory to us.

3. The register date and issue date of the new policy will be the same as the date of conversion. Premiums and charges for the new policy will be based on the company's rates in effect for the new policy for the then current issue age of the insured person and the same class of risk or the closest comparable class as under this policy. You may request a more favorable risk classification for the insured person; however, this will be subject to evidence of insurability satisfactory to us.

4. Any additional benefit riders in effect under this policy will be included with the new policy only if they are then available with the new policy as of its issue date. You may request to add new additional benefit riders to the new policy; however, this will be subject to evidence of insurability satisfactory to us.

5. Any policy loan and accrued loan interest under this policy must be repaid prior to conversion.

The suicide exclusion and contestable periods of the new policy will be determined from the date of issue of this policy rather than the date of issue of the new policy, except to the extent evidence of insurability was required as noted in the first paragraph of this provision and in items 2, 3, and 4.

**EXHIBIT B**

We will waive the surrender charge applicable to this policy on the date of conversion up to, but not to exceed, the amount of the first year surrender charge for the new policy. We will retain the excess, if any, over this amount and deduct it from this policy's Policy Account on the date of conversion. We will transfer the balance of your Policy Account Value to the new policy. Your Policy Account Value for the new policy will be allocated to the investment options under the new policy as directed by you on the application completed for the conversion, and in accordance with the terms of the new policy. The initial premium and deduction allocation percentages that you specify on the application will continue to apply unless later changed by you. Monthly deductions for the new policy, including any additional benefit riders, will start on the register date of the new policy. The new policy will be subject to all charges according to its terms. Coverage under this policy will terminate on the conversion date.

You may examine the new policy and cancel it if you are not satisfied with it; you will have as many days after the conversion date to do this as you had to cancel this policy after it was delivered to you originally. You must send a written request for cancellation within this time period to our Administrative Office. If you do this, we will (1) reinstate this policy and the same additional benefit riders, if any, that you had originally and (2) refund any premium payments made under the new policy.

**EXHIBIT B**

# *Accelerated Death Benefit Rider*

**Disclosure.** The receipt of the Accelerated Death Benefit Amount may be taxable. You should seek assistance from your personal tax advisor prior to electing the benefit.

*In this rider "we", "our" and "us" mean AXA Equitable Life Insurance Company. "You" and "your" mean the Owner of the policy at the time an Owner's right is exercised.*

---

**Effective Date of this Rider.** This rider is effective on the Register Date of this policy. If this rider is added after issue of this policy, the effective date of this rider is shown on the Additional Benefits Rider to which it is attached.

**Cost Of This Rider.** There is no premium or cost of insurance charge for this rider.

**This Rider's Benefit.** We will pay an Accelerated Death Benefit in the amount requested by the owner, if the insured person is terminally ill, subject to the provisions of this rider. We will pay an Accelerated Death Benefit under this policy only once and in one lump sum.

The maximum Accelerated Death Benefit payment you may receive is the lesser of:

1.   75% of the death benefit payable under this policy, less any outstanding policy loan and accrued loan interest, and

2.   $500,000.

The maximum aggregate amount of Accelerated Death Benefit payments that will be paid under all policies issued by us or our affiliated companies on the life of the insured person is $500,000.

For purposes of this benefit, the death benefit does not include any accidental death benefits, non-convertible term riders or convertible term riders with an expired conversion period, or any other benefits payable upon the death of any person other than the insured person under the base policy.

We reserve the right to deduct a processing charge of up to $250.00 per policy from the Accelerated Death Benefit payment.

We reserve the right to set a minimum of $5,000 on the amount you may receive under this rider.

To be eligible for this benefit you must provide satisfactory evidence to us that the insured person's life expectancy is twelve months or less. This evidence must include, but is not limited to, certification by a physician licensed to practice medicine in the United States or Canada and who is acting within the scope of such license. A physician does not include the owner, the insured person, or a member of either the owner's or insured person's family.

**How This Rider Relates To The Policy.** This rider is a part of the policy. Its benefits are subject to all terms of this rider and the policy. This rider has no cash or loan value. This rider is non-participating.

**Interest.** Interest will be charged on the amount of the Accelerated Death Benefit and on any unpaid premium we advance after an Accelerated Death Benefit payment. The interest rate at the time of the Accelerated Death Benefit payment is made will not exceed the greater of the following on such date:

1.   the yield on a 90-day treasury bill; or

2.   the maximum adjustable policy loan interest rate permitted in the state in which this policy is delivered.

**Effect Of Accelerated Death Benefit Payment On The Policy.** The Accelerated Death Benefit payment, plus any accrued interest, will be treated as a lien against the policy values. The amount of the lien will be pro-rated against the policy's net cash surrender value, if any, and the net amount at risk. If your policy is a variable or universal life policy, the net amount at risk is the death benefit minus the policy account, if any. If your policy is a term or whole life policy, the net amount at risk is the death benefit minus the cash surrender value, if any.

Additionally, if your policy is a variable life policy, the portion of the cash surrender value that is on lien and is allocated to investment funds of the Separate Account (SA) will be transferred to and maintained as part of the unloaned portion of the Guaranteed Interest Account (GIA). You may tell us how much of the accelerated payment is to be transferred from each investment fund. Units will be redeemed from each investment fund sufficient to cover the amount that is on lien and transferred to the unloaned portion of the GIA. If you do not tell us how to allocate the payment, we will allocate it based on our rules then in effect.

**EXHIBIT B**

However, if your variable policy does not have a GIA, the portion of the cash surrender value that is on lien will be transferred to and maintained in the Money Market Fund of our SA. Such transfers will occur as of the date we approve an Accelerated Death Benefit payment; there will be no charge for such transfers. The amount payable at death under the policy will be reduced by the full amount of the lien and any other indebtedness outstanding under the policy. Your access to the policy's cash surrender value will be limited to the excess of the policy's cash surrender value over the amount of the lien secured against the cash surrender value and any other outstanding policy loans and accrued loan interest.

**Effect Of Accelerated Death Benefit Payment On Policy Premiums.** If your policy is a term, whole life or any other fixed premium policy, premiums will be required to be paid after an Accelerated Death Benefit payment. If any premium is not paid when due, we will advance the amount of the unpaid premium and add it to the lien.

If your policy is a flexible premium variable or universal life policy, and after an Accelerated Death Benefit payment the policy at the beginning of a policy month is in default, we will advance a premium sufficient to keep the policy in force and add it to the lien.

However, if a Disability Premium Waiver Rider or a Disability Waiver of Monthly Deductions Rider is in effect under the policy, this policy's premium or monthly deductions will be waived as of the date we approve an Accelerated Death Benefit payment.

**Rider Limitations.** Your right to an Accelerated Death Benefit payment is subject to the following conditions:

1. The policy must not be in the grace period.
2. The policy must be in force other than as extended term insurance.
3. For term insurance policies, there must be at least one year left before the final term expiry date.
4. You must submit a claim in writing to our Administrative Office in a form satisfactory to us.
5. Prior to the Accelerated Death Benefit payment, we will require from any assignee or irrevocable beneficiary a signed acknowledgment of agreement for such payment.
6. For joint last-to-die policies, a claim may be made under the rider only after the death of the first of the insured persons.
7. You may not be eligible for the Accelerated Death Benefit payment if we are notified that:
   a) you are required by law to elect this rider's benefit in order to meet the claims of creditors, whether in bankruptcy or otherwise; or
   b) you are required by a government agency to elect this rider's benefit in order to apply for, obtain, or keep a government benefit or entitlement.
8. You may request only one Accelerated Death Benefit payment per policy.
9. We may require examination of the insured person by our medical representatives at our expense as part of any proof to establish eligibility for benefits under this rider.

**When This Rider Terminates.** Prior to any Accelerated Death Benefit payment you may terminate this rider by providing written notice in a form satisfactory to us and returning the rider to our Administrative Office. The effective date of termination will be the date your request is received at our Administrative Office. Once this rider has been terminated, another Accelerated Death Benefit Rider cannot be attached to the policy.

This rider will terminate when the policy terminates. If at any time the amount of the lien equals the total death benefit, the policy will terminate. Termination will occur 31 days after we have mailed notice to the last known address of the owner, unless the full amount of the lien is repaid within 31 days of the notice.

## AXA Equitable Life Insurance Company

Karen Field Hazin, Vice President,
Secretary and Associate General Counsel

Christopher M. Condron,
Chairman and Chief Executive Officer

R06-70

**EXHIBIT B**

# AMENDMENT TO APPLICATION

Name of
Proposed Insured ___ALVIN L FISCHBACH_____ Application Dated ___DEC 19, 2006___
                            First      Middle Initial      Last

Policy No _____156 232 048_____

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars:

ISSUE WITH GUIDELINE PREMIUM TEST.

ISSUE WITH ANSWER TO QUESTION 1H ON APPLICATION TO BE                ISSUE WITH
ANSWER TO 2J TO BE NO.

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said
application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the
policy. To the best of my knowledge and belief, in all other respects the statements and answers in the
application continue to be, without material change, true and complete as of the date of this amendment.

Dated at ___NEWPORT BEACH, CA_____ on ___2/1/07___
              (City)              (State)

____B QQ2 TEC_____          _____
Signature of Purchaser if other than Applicant          Signature of Applicant

Agent: _____
Agency:

EV 237-400 App. Amendment.    (B)

                                                                30

                                                        **EXHIBIT B**

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
Part I
Form No. LIFEAPP-IN
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy). Please print in ink.

Proposed Insured

A. Full Name: First  ALVIN  M.I. L  Last  FISCHBACH    B. Gender: ☒ Male  ☐ Female

C. Home Address: _____ No. and Street _____

City/Municipality _____ (If address is a P.O. box or not actual residence, proof of residence required) _____ State  IN  Zip + 4 Code  47944

D. Home Phone No. _____ Best time to Call: 8:00-5:00  Best phone no. to be contacted: _____

E. Date of Birth: _____ (Month/Day/Year)    F. Place of Birth: _____ (State/County)

G. Marital Status:  ☐ Single  ☐ Married  ☒ Widowed  ☐ Divorced  ☐ Separated    H. Soc. Sec. No. _____

I. Driver's Lic. No. _____ State: _____

J. U.S. Citizen? ☒ Yes  ☐ No* If No, County _____ U.S. Visa Type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

K. Currently employed?  ☐ Yes  ☐ No  ☒ Retired

L. Current Occupation(s): (1) Title _____ (2) Duties _____ (If less than 1 year at current occupation, give previous in Remarks.) (3) How Long? _____

M. Employer Name: _____

N. Employer Address: _____ No.& Street _____ City _____ State _____ Zip + 4 Code _____

O. Annual Earned Income (Income from occupation) $ _____ P. Net Worth $ _____

If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❷ COVERAGE INFORMATION**

A. Plan of Insurance  ATHENA UL II  Amount of Insurance $ _____
(If survivorship policy, complete an application for each Proposed Insured. If VUL, must also complete VUL Supplement. To select dividend options on EWL, or Riders on all Non-VUL Plans complete Optional Benefits Supplement.)    (If face amount is $2 million or larger complete Financial Supplement.)

B. Complete for UL or VUL only  (1) Death Benefit Option  ☒ Option A  ☐ Option B
(2) Planned Periodic Premium $ _____

C. Definition of Life Insurance Test: Complete for AUL II, IL, II, COLI '04 _____ ☐ Guideline Premium Test  ☐ Cash Value Accumulation Test

D. Premium Mode: ☒ Annual  ☐ Semi-Annual  ☐ Quarterly  ☐ Monthly
Or
System-Matic (Complete S-M form and check applicable box)  ☐ Quarterly (only available for UL and VUL)  ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (Specify Allottee name, if other than here in Remarks.) (2) Unit/Sub Unit. No. _____ (3) Unit Register Date _____

F. Date Policy to have Insured Age?  ☐ Yes  ☒ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market?  ☐ Yes  ☒ No
2. Have you, the owner, or any Proposed Insured (if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider?  ☐ Yes  ☒ No

H. Any other life insurance now in effect or application now pending?  ☒ Yes  ☐ No
(Give cooperative, amounts and policy numbers in Remarks.)

I. Will the coverage applied for replace any life insurance or annuities?  ☐ Yes  ☐ No  Is this a 1035 Exchange?  ☐ Yes  ☐ No
If "Yes", complete: (If additional room is needed, please use Remarks Section.)
Amount $ 25,000  Company  EQUITABLE  Issue Year _____ Policy Number _____ ☐ Life  ☐ Group  ☐ Annuity
Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life  ☐ Group  ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option?  ☐ Yes  ☒ No  If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

K. Complete if Proposed Insured is under age 15:  a) State total amount of insurance in force on the life of applicant or child's parent, if greater $ _____
b) Are any other children in the family insured a lesser amount?  ☐ Yes  ☐ No

If "Yes" give details _____

AMIGV-2005 IN _____ 154 _____ E8173_23  1

31

**EXHIBIT B**

**③ BENEFICIARY/OWNER**

**A.** Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

Beneficiary Full Name      Relationship to Insured      Percentage

Primary: **ALVIN FISCHBACH IRREVOCABLE TRUST**    **TRUST**    **100%**

Contingent:

**B.** Owner (The Owner of this policy is the insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name: **ALVIN FISCHBACH IRREVOCABLE TRUST**    Social Security # or TIN

Address: Street    City **CARLSBAD**    State **CA**    Zip Code **92008**
(Mailing address will be used to run Owner as this address unless otherwise directed in Remarks Section)

U.S. Citizen? ☐ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

Relationship to Insured **TRUST**    Date of Birth _____

Name of Trustee **DAVISON & OLANNE**    Date of Trust Agreement **12/13/2006**

If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**④ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

| | | Yes | No |
|---|---|---|---|
| A. | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.) | ☐ | ☐ |
| B. | Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement.) | ☐ | ☐ |
| C. | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ | ☐ |
| D. | In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.) | ☐ | ☐ |
| E. | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.) | ☐ | ☐ |
| F. | Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks.) | ☐ | ☐ |
| G. | In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates.) | ☐ | ☐ |
| H. | Do you currently use any form of tobacco or nicotine product?   ☐   Type _____ Avg. Quantity/packs _____ Frequency _____ | | |
| I. | Have you ever used any form of tobacco or nicotine product?   ☐   Type _____ Date Ceased _____ | | |

**⑤ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

**A.** Height _____ Weight _____ lbs.

**B.** Personal Physician Name _____

**C.** Address _____

**D.** Date and Reason for Last Visit in the Last 5 Years _____

**E.** What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

**F.** In the last 10 years, ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder?

**G.** In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.)

**H.** In the last 10 years:

   1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.)

   2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings of membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement.)

**I.** In the last 10 years, been:

Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession?

**J.**

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | | |
| Mother | | | |
| Sibling | | | |

AMIGV-2005 IN

2

**EXHIBIT B**

**6** DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION      (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (Include specific diagnosis and medication) *(reserve here)* | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.      (Attach additional sheet of paper if necessary and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

_____
_____
_____
_____
_____
_____
_____
_____

**7** COMPLETE IF MONEY IS PAID WITH THE POLICY:

Amount paid with this Application: $ _____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including:

(i) the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii) the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?          ☐ Yes     ☐ No

(If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.)

**AGREEMENT.** Each signer of this application agrees that:

1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.

2) The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

3) Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid.

4) No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

5) I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

AN40V-2005 IN

5

**33**

**EXHIBIT B**

☐ AXA Equitable Life Insurance Company      ☐ MONY Life Insurance Company of Amer.

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**
I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**
**TO OBTAIN HEALTH INFORMATION**
I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) AXA Equitable Life Insurance Company or MONY Life Insurance Company of America, as applicable, and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**
I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**
I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency, in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**
I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**
You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**
Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization. This application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of the application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**
I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE. ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (II) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) bound by all of the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.
Dated at City _____

State ___INDIANA___

on ___12/19/2006___

X _____ (signature)
Signature of Proposed Insured, Applicant, or parent or guardian.

Proposed Insured's SSN or Issue Age (0-14)

_____
Signature of Owner or Applicant (if not Proposed Insured
(if corporation, print firm's name and signature of authorized officer.)
(if trust, signature of trustee.)

**Financial Professional to complete this section:**

Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?  ☐ Yes  ☒ No
(if "yes" give details _____)

I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.

☐ I have witnessed the signature required on fully completed Part 1  ☒ I have not witnessed the signature required on fully completed Part 1. (Explain below)
DONE THROUGH MAIL + OVER THE PHONE

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name ___KEVIN YUKUS___

AM/GV-2005 IN

34

**EXHIBIT B**

**Application Part 2 To:** ☒ **AXA Equitable Life Insurance Company**    Page 1 / 2

☐ **AXA Life and Annuity Company**

**PARAMEDICAL**

1. a. Proposed Insured          First Name          Reason for submission of this form:  ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

REDACTED

REDACTED

**EXHIBIT B**

35



**Application Part 2 To:** ☐ AXA Equitable Life Insurance Company

☐ AXA Life and Annuity Company

**PARAMEDICAL**          Reason for submission of this form: ☐ New Policy   ☐ Policy Change   ☐ Reinstatement

REDACTED

REDACTED

**EXHIBIT B**

36

AXA Equitable Life Insurance
1290 Avenue of the Americas
New York, NY 10104

MONY Life Insurance Company of L.
1290 Avenue of the Americas
New York, NY 10104

**Financial Supplement**
Form No. F79-GV (2006)

## Financial Supplement Forming Part of the Application for Life Insurance

Name    ALVIN L. FISCHBACH

☒ Proposed Insured
☐ Additional/Joint Insured

### Personal Financial Statement (For Personal Insurance)

1. Balance Sheet

| Current Assets | Amount | Current Liabilities | Amount |
|---|---|---|---|
| Liquid | $ | Mortgages | $ |
| Other (specify) | $ | Other (specify) | $ |
| Total | $ | Total | $ |
| | | Net Worth | $ |

2. Income

| | Earned Income | | Unearned Income | | | |
|---|---|---|---|---|---|---|
| | | Div/Interest | Rental Income | Pension/Soc Sec | Other-specify FARM | Total |
| Current Year | $ | $ | $ | $ | $ | $ |
| Last Year | $ | $ | $ | $ | $ | $ |

3. How was face amount determined?
State what formula was used (e.g., estimated fair market value, capitalization of earnings, etc.) If none, state none.
CURRENT NET WORTH GROWING @ 6% FOR 10 YRS. MINUS EXCEPTION

4. Do you expect any changes greater than 15% in income or net worth in the next 12 months? TO DETERMINE    YES ☐    NO ☒
If "yes", explain    ESTATE TAX

5. Have you filed for bankruptcy in the past 5 years?    LIABILITY    YES ☐    NO ☒
If "yes", chapter _____    Date Open _____    Date Closed _____

### Business Information (For Business Insurance)

6. Type of business    ☐ Sole Proprietorship    ☐ Partnership    ☐ Corporation    ☐ Limited Liability Corporation

7. Name of business _____    Nature of business _____

8. How long has business been in operation? _____ years

9. % of business owned _____ %
Are all members of firm being similarly insured?    ☐ Yes    ☐ No
a. If "yes", provide details of business coverage issued or applied for on other numbers (Use Separate Sheet if Necessary)
Name    Position/Title    % Owned    Business insurance in force/applied for

b. If "no", explain reason _____

10. Business finances for past 2 years:

| Year | Assets | Liabilities | Retained Earnings | Gross Sales | Net Profit |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |
| | $ | $ | $ | $ | $ |

11. Has the business filed for bankruptcy and/or reorganization in the past 5 years?    YES ☐    NO ☐
If "yes", explain _____

### Other Information (For Personal and/or Business)

12. Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)    ☐ Yes    ☒ No

Check all of the following that apply and complete requested information:
☐ Loan _____ (% of premium) Identify Source of Loan _____
Loan Repayment Schedule _____
Describe the collateral used _____
☐ Cash _____ (% of premium)
☐ Existing life insurance policy or contract _____ (% of premium)
☐ Existing investments _____ (% of premium) Identify Investment
Source _____

13. Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.)
as an inducement to enter into this transaction? (If Yes, describe the inducement)    ☐ Yes    ☒ No

14. Please state the reason you are purchasing this policy (e.g., estate planning, business insurance, etc.)
ESTATE PRESERVATION, FAMILY PROTECTION

180-6004 (2006)    Cat. # 134007    ESB10_core

**37**

**EXHIBIT B**

**References (Personal and/or Business)**

Attorney: BRENDAN OZANNE - LAWSON + OZANNE

Name                                      Business Address

Accountant: WENDELL LAWSON

Name                                      Business Address                                    Telephone No.

Other:

Name                                      Branch                                              Title of Account

Name                                      Branch                                              Title of Account

Have brokers, attorney and accountant been authorized to release information?    ☒ Yes    ☐ No

If "no", explain

I represent that the statements and answers in this Supplement are true and complete.

_Alan L. Buchbinder_                                                       Date  1/5/2007

Signature of Proposed Insured/Additional Joint Insured

Signature of Owner if other than Insured

Signature of Licensed Financial Professional/Insurance Broker

180-6004 (2006)                          Cat. # 134000                          E5810_edot

38

**EXHIBIT B**

# AXA EQUITABLE
LIFE INSURANCE COMPANY

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100IN