# AXA EQUITABLE

AXA Equitable Life Insurance Company

AXA Life and Annuity Company

**DATE OF ISSUE:    JAN 24, 2007**

## DELIVERY RECEIPT

By signing below, I (we) certify and acknowledge that:

(1)    I (we) have received Policy Number: **156 232 048**

on the life (lives) of **ALVIN L. FISCHBACH**

and

The contract state is **INDIANA**

(2)    Unless I (we) meet the terms of coverage under the Temporary Insurance Agreement, coverage under this Policy will begin on the date this receipt is signed and given to an AXA Equitable representative along with the first model premium payment. If I (we) pay the applicable premium upon delivery, AXA Equitable will move the Register Date of my Policy showing in the Policy Pages to the date of delivery to insure that the charges and premiums for the Policy commence on the same date as coverage under the Policy, unless I (we) request a different Register Date in writing or moving the Register Date will cause an increase in Issue Age(s). Coverage under this Policy shall not take effect before any Register Date specified in this Policy.

(3)    All persons proposed for insurance under this Policy are living.

(4)    No insurance shall take effect on this Policy: (a) until a Policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; and (b) unless to the best of my (our) knowledge and belief the statements in all parts of the application continue to be true and complete, without material change, as of the time the Policy is delivered and the full initial premium for it is paid.

(5)    For those Policies delivered on the 29, 30, or 31st of any month, AXA Equitable will move the Register Date to the 1st of the following month, which will change the Investment Start Date, if applicable, and the Interest Crediting Date, if applicable. Further, the current interest rate for the Guaranteed Interest Account, if applicable, or the current interest rate for UL policies, if applicable, may also change.

Signed At: **NEWPORT BEACH, CA**
City, State

Date **2/1/07**    Signed  X ~~Bool~~ ~~TSE~~
**ON BEHALF OF ALVIN FISCHBACH IRR TR 20061213**

Date _____    Signed  X _____

Agent: **YURKUS KEVIN**  _____    ASU ___  MBD _____

## RETURN TO ISSUING OFFICE:

AXA EQUITABLE NATIONAL OPERATIONS CENTER
POST OFFICE BOX 1047
CHARLOTTE, NORTH CAROLINA 28201
(800) 777-6510

DR(1)

**EXHIBIT C**

**41**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | JURY TRIAL DEMANDED |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No._____ |
| ) | |
| LYDIA CAPITAL, LLC, ) | |
| GLENN MANTERFIELD, and ) | |
| EVAN ANDERSON, ) | |
| ) | |
| Defendants. ) | |

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges the following in this emergency enforcement action against defendants:

PRELIMINARY STATEMENT

1.    This matter involves an ongoing fraudulent investment scheme carried out by Defendant Lydia Capital, LLC ("Lydia" or the "Adviser") and its two principals, Defendants Glenn Manterfield ("Manterfield") and Evan Anderson ("Anderson"), involving sales to investors in Taiwan of "limited partnership interests" in an unregistered fund, Lydia Capital Alternative Investment Fund LP (the "Fund"), based in Boston.

2.    As further detailed below, Defendants are offering and selling hedge fund interests to investors and potential investors and not disclosing material facts and/or omissions to the investors, including, but not limited to the fact, that the Fund's principal underlying assets – i.e., life insurance policies – may be either worthless or virtually worthless.

EXHIBIT D

43

3.    As further detailed below, the Commission is seeking emergency relief because it learned today that Defendants may be seeking to transfer investor assets out of its brokerage account.

4.    As a result of the above, Defendants engaged in: (i) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; (ii) fraudulent or deceptive conduct in connection with the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") and (iii) fraudulent or deceptive conduct with respect to investment advisory clients, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

5.    Accordingly, the Commission seeks: (i) permanent injunctions prohibiting defendants from further violations of the relevant provisions of the federal securities laws; (ii) disgorgement of defendants' ill-gotten gains and unjust enrichment, plus pre-judgment interest; and (iii) the imposition of civil monetary penalties due to the egregious nature of defendants' violations. In addition, because of the risk that defendants will continue violating the federal securities laws and the danger that any remaining investor funds will be dissipated or concealed before entry of a final judgment, the Commission seeks preliminary equitable relief to: (i) prohibit defendants from continuing to violate the relevant provisions of the federal securities laws; (ii) freeze defendants' assets and otherwise maintain the status quo; (iii) require defendants to submit an accounting of investor funds and other assets in their possession; (iv) prevent defendants from destroying relevant documents; (v) prohibit defendants from continuing to

2

EXHIBIT D

44

accept or deposit investor funds; and (vi) authorize the Commission to undertake expedited discovery.

### JURISDICTION

6.    The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)]. The Commission seeks the imposition of a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C.§77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

7.    This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa], and Sections 209(3) and 214 of the Advisers Act [15 U.S.C. §80b-9(d), 80b-14]. Venue is proper in this District because much of defendants' wrongful conduct occurred here and at least some of the defendants' ill-gotten gains remain within the District.

8.    In connection with the conduct described in this Complaint, defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

### DEFENDANTS

9.    Lydia Capital, LLC (SEC File Number 801-66292) is a Delaware limited liability company established in February 2006, and is headquartered in Boston, Massachusetts. Lydia Capital is a registered investment adviser to Lydia Capital Alternative Investment Fund

3

("Fund"), L.P., an unregistered fund located in Boston, Massachusetts. The Fund, a Delaware
limited partnership, is engaged in buying and selling life settlements (or insurance policies).

10.    Glenn Manterfield, 44, is believed to be a resident of Sheffield, United
Kingdom, and is one of Lydia's two principals.

11.    Evan Anderson, 25, is believed to be a resident of Boston, Massachusetts, and is
one of Lydia's two principals.

## STATEMENT OF FACTS

12.    Lydia solicits investors for the Fund through a Private Placement Memorandum
("PPM"). The PPM states that the Fund purchases life insurance policies in the life settlement
aftermarket on insured individuals aged 65 or older with a life expectancy of between two and
ten years. Through finders and/or brokers in Asia, Lydia has raised approximately $33 million in
investments in the Fund from at least 57 investors in Taiwan.

13.    Contrary to statements in the PPM, Lydia's agents, SLS and Stanford Group,
solicit individual seniors to purchase life insurance policies by obtaining a medical underwriter's
evaluation of the life expectancy of those individuals prior to the individual applying for a life
insurance policy. On approximately half of the applications, the individuals falsely claimed that
they had no intention to sell their policies, when in fact, they obtained policies intending to sell it
to Lydia's agents (SLS or Stamford Group).

14.    Life insurance companies have a right to rescind the aforementioned policies
based on false representations in the application. Recision would render the policies nearly
worthless, and diminish or obliterate the value of the Fund. Lydia, Manterfield and Andersen
knew of this material risk because they set into motion the process whereby individuals would

4

EXHIBIT D

obtain the policies by making false statements and then the Defendants took possession of the policies and fraudulent applications upon the Fund's purchase of the policies from the individuals. The Fund's PPM misleads investors by omitting this significant risk, and by failing to disclose that the value of the Fund is dependent on numerous insurance policies that have been obtained through false statements. Lydia, Manterfield and Andersen used the fraudulent PPM to solicit actual and potential investors for the Fund.

15. Further, Lydia's website contains false and misleading postings of the Fund's "NAV" appreciation. First, Lydia has no legitimate basis for such valuations of the Fund because the valuations it is posting are from non-independent sources – SLS and Stamford Group, the entities that sell the insurance policies to the Fund. In addition, the website states that the NAV appreciation for July 2006 was 1.69%, when in fact, the Fund held no assets until it purchased its first policy in August 2006. Lydia, Manterfield and Andersen knew that the July 2006 NAV appreciation was incorrect because they knew that the Fund had no actual assets upon which to obtain appreciation. Lydia, Manterfield and Andersen used the firm's website and the false statements therein to solicit actual and potential investors. The firm's website as of today still contains this misrepresentation. Lydia, Manterfied and Anderson have misappropriated assets from the Fund by drawing fees, compensation and expenses to which they were not entitled.

16. The Fund's February 2007 newsletter to investors in the Fund, signed by Glenn Manterfield, repeats the false July 2006 appreciation and states that it was the "best ever" increase in NAV for the Fund.

5

17.    Approximately $8.8 million in investor funds have been wired to a Smith Barney account in the name of Lydia that is controlled by Andersen and Manterfield. Apparent investors have wired money to this account as recently as April 11, 2007.

18.    The Commission staff learned today that Andersen wants to move the money out of the Smith Barney account.

19.    Further, investor funds are in accounts of an escrow agent for Lydia, including an account at National City Bank in Cleveland.

20.    As a result, the staff seeks the emergency relief sought below, including an ex parte temporary restraining order, preliminary injunction, and an asset freeze.

**FIRST CLAIM FOR RELIEF**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5)**

21.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 of the Complaint as if set forth fully herein.

22.    Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or has omitted or is omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

6

**EXHIBIT D**

**48**

- Case 3:08-cv-00569-BTM-BLM    Document 1-2    Filed 03/26/2008    Page 9 of 47

23.    As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### SECOND CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act)

24.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 of the Complaint as if set forth fully herein.

25.    By reason of the foregoing, defendants, directly or indirectly, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the purchaser of securities in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

26.    As a result, Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act.

### THIRD CLAIM FOR RELIEF
### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

27.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 of the Complaint as if set forth fully herein.

28.    Defendants were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

**EXHIBIT D**

49

29. Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly: (i) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

30. As a result, Defendants have violated and, unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§80b-6(1), (2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter a temporary restraining order, order freezing assets and order for other equitable relief in the form submitted with the Commission's motion for such relief and, upon further motion, enter a comparable preliminary injunction, order freezing assets and order for other equitable relief;

B. Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

1. Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

2. Section 17(a) of the Securities Act [15 U.S.C. § 17q(a)];

3. Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §80b-6(1), (2)];

8

EXHIBIT D

50

C.    Require Defendants to disgorge their ill-gotten gains and unjust enrichment, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

D.    Order Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

E.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.    Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Silvestre A. Fontes (BBO #627971)
fontess@sec.gov
Martin F. Healey (BBO #227550)
healeym@sec.gov
R. Daniel O'Connor (BBO #634207)
oconnord@sec.gov
Senior Trial Counsel

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street
Boston, MA 02110
(617) 573-8991 (Fontes)
(617) 573-8952 (Healey)
(617) 573-8979 (O'Connor)
(617) 573-4590  fax

April 12, 2007

9

**EXHIBIT D**

51

EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-cv-10712-RGS |
| ) | |
| LYDIA CAPITAL, LLC, ) | |
| GLENN MANTERFIELD, and ) | |
| EVAN ANDERSEN, ) | |
| ) | |
| Defendants. ) | |

## AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### PRELIMINARY STATEMENT

1.      During the period from June 2006 through April 2007 (the "Relevant Period"),
Defendants Glenn Manterfield ("Manterfield"), a convicted felon, and his business partner Evan
Andersen ("Andersen"), acting through their investment advisory firm, Defendant Lydia Capital,
LLC ("Lydia"), engaged in a scheme to defraud investors in a hedge fund, Lydia Capital
Alternative Investment Fund LP (the "Fund"). During the Relevant Period, more than 60
investors purchased approximately $34 million in limited partnership interests in the Fund. The
Defendants told investors that they intended to use the Fund's assets to acquire a portfolio of life
insurance polices in the life settlement market. The Defendants materially misled investors
about their operations and misappropriated millions dollars of investors' funds.

2.      Manterfield, Andersen, and Lydia sold limited partnership interests and retained

1

investors in the Fund through a series of material misrepresentations and omissions, including but not limited to: (1) materially overstating, and in some instances completly fabricating the Fund's performance; (2) inventing business partners, offices, and investors in an attempt to legitimatize the firm and concealing the truth as to why key vendors and banks ceased relationships with the Defendants; (3) lying about Manterfield's significant criminal history, and failing to disclose a February 2007 criminal asset freeze in England; (4) lying about how the Fund planned to address certain material risks and failing to disclose others; and (5), misstating the nature of the Fund's assets and its investment process.

3.      In addition to making serious material misrepresentations and omissions, Defendants misappropriated millions of dollars of investors' funds. Defendants, because of the serious nature of their fraud, were not entitled to draw either performance or maintenance fees, and admit they drew none. Defendants, however, withdrew $8.16 million of investor funds, supposedly maintained in "safe" escrow accounts beyond Defendants' reach. The money was supposedly obtained as payment for mark-ups applied to assets sold to the Fund and reimbursement for other unidentified expenses. Even assuming that the Defendants' fraud had not negated their right to receive any compensation, which it did, the Defendants were, at best, entitled to receive a mark-up of approximately $1.58 million to $2.64 million plus some smaller amount for reimbursement of expenses. Moreover, because the withdrawal of the $8.16 million from escrow was in no way actually tied to the sale of assets to the Fund, Defendants' mark-up explanation on internal records was nothing more than an attempt to cover up their misappropriation of investors' cash.

4.      By engaging in the conduct alleged in this Complaint, Defendants Manterfield,

2

Andersen, and Lydia violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and Sections 206(1) and

206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6 (1) and

80b-6 (2)].

5.     Unless restrained and enjoined, Defendants are likely to commit further violations

in the future. Accordingly, the Commission seeks: (i) entry of a permanent injunction

prohibiting Defendants from further violations of the relevant provisions of the federal securities

laws; (ii) disgorgement of Defendants' ill-gotten gains and unjust enrichment, plus pre-judgment

interest; and (iii) the imposition of civil monetary penalties due to the egregious nature of

Defendants' violations. In addition, because of the risk that Defendants will continue violating

the federal securities laws and the danger that any remaining investor funds will be dissipated or

concealed before entry of a final judgment, the Commission seeks preliminary equitable relief to:

(i) prohibit Defendants from continuing to violate the relevant provisions of the federal

securities laws; (ii) freeze Defendants' assets and otherwise maintain the status quo; (iii) require

Defendants to submit an accounting of investor funds and other assets in their possession; (iv)

prevent Defendants from destroying relevant documents; (v) require the repatriation of any and

all assets abroad that were obtained or derived from the violative securities transactions; (vi)

prohibit Defendants from continuing to accept or deposit investor funds; and (vii) other equitable

relief as necessary to prevent additional harm.

6.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C.

3

**EXHIBIT E**

55

§§ 78u and 78aa], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9]. The Commission

seeks the imposition of a civil monetary penalty pursuant to Section 20(d) of the Securities Act

[15 U.S.C.§77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section

209(e) of the Advisers Act [15 U.S.C. §80b-9(e)]. Many of the acts and transactions constituting

violations occurred primarily within the District of Massachusetts and at least some of the

Defendants' ill-gotten gains remain within the District.

<u>DEFENDANTS</u>

7.    Lydia was a Delaware limited liability company established in February 2006,

with an office in Boston, Massachusetts. Lydia was registered as an investment advisor with the

Commission. Lydia was an investment adviser to and general partner of the Fund. The Fund, a

Delaware limited partnership, was a pooled investment vehicle set up to purchase and sell all

types of securities, with a focus on investing in interests in life insurance policies. Lydia's sole

employees, Manterfield and Andersen, are also its owners.

8.    Manterfield, age 44, is a resident of Sheffield, England and was one of Lydia's

two principals and a 50% owner of the firm. During the Relevant Period, Manterfield acted as

an investment adviser, and as such, Manterfield had a fiduciary duty to his advisory clients.

Manterfield traveled to the United States on several occasions in furtherance of the fraud alleged

herein and held himself out as a director of the Boston-based Lydia. Manterfield has an

extensive criminal record with arrests and convictions for fraud and theft felonies. He is under

investigation in England for acquiring criminal property, a potential felony charge, and on

February 1, 2007, an English court froze all assets that Manterfield controlled directly or

indirectly, but allowed Manterfield, to the extent that the was not imprison, to spend up to £300 a

4

week towards his ordinary living expenses.

9.        Andersen, age 25, is a resident of Boston and is one of Lydia's two principals and a 50% owner of the firm. During the Relevant Period, Andersen acted as an investment adviser, and as such, Andersen had a fiduciary duty to his advisory clients. Andersen held himself out as a director and chief compliance officer of Lydia, and worked primarily out of Boston.

## DETAILED ALLEGATIONS

### Defendants Misappropriated Investors' Funds

10.      In addition to the making serious material misrepresentations and omissions, Defendants misappropriated millions of dollars of investors' funds. Defendants, because of the serious nature of their fraud, were not entitled to draw either performance or maintenance fees, and admit they drew none. Defendants, however, withdrew investor funds supposedly maintained in "safe" escrow accounts beyond Defendants reach. Defendants withdrew $8.16 million of the Fund's assets from various escrow accounts as supposed payment for mark-ups applied to assets sold to the fund and reimbursement for expenses.

11.      The June 2006 private placement memorandum provides that Lydia "intends to purchase life insurance polices through its contacts and resell such policies to the [Fund] to become a part of the [Fund's] portfolio. Lydia intends to sell policies to the [Fund] for at a minimum mark-up of 3% to 5% of the face value of the policy." Although the 3% to 5% is described as a minimum fee, the Defendants never calculated a mark-up fee using a higher amount, and to the extent they actually calculated a fee, they used 4%. In early January 2007, Defendants announced to investors that Lydia would no longer charge a mark-up fee on the sale of assets to the Fund, and modified the existing private placement memorandum to reflect the

5

change.

12.    Defendants kept few if any records to show exactly when the Fund, or one of its indirect agents, acquired interests in insurance policies. At best, however, before announcing the change in early January 2007, the Fund acquired interests in thirteen insurance polices with a combined face value of $52,750,000. Using the 3% to 5% mark-up, Lydia would have been entitled to a fee of approximately $1.58 million to $2.64 million, not the $8.16 million that Defendants took out of the Fund's various escrow accounts. Moreover, Lydia's first two withdrawals from escrow accounts, totaling approximately $1.6 million, were made before the Fund or any agent had actually bought an interest in a single life insurance policy. Subsequent withdrawals also were not timed to match asset purchases by the Fund.

13.    Under the Limited Partnership Agreement and as stated in the various private placement memoranda, Lydia was entitled to receive reimbursement for certain expenses. Once again, however, Lydia's bookkeeping was deficient and not in keeping with its fiduciary duty or requirements imposed by the Advisers Act. Lydia did not incur reimbursable expenses that justify the $8.16 million withdrawn from the Fund, even if Lydia was entitled, and it was not, to receive a mark-up on certain assets acquired by the Fund.

14.    Of the $8.16 million wrongfully withdrawn from the Fund's escrow accounts, approximately $2.35 million was transferred to Manterfield's personal account and approximately $2.35 million was transferred to an account controlled by Andersen.

15.    Defendants' poor or nonexistent record keeping makes it impossible at this point in time to determine to the penny the amount of the misappropriations. The total outflows from Lydia's accounts, other than transfers to accounts controlled by Manterfield or Andersen, totaled

6

**EXHIBIT E**

58

to approximately $3.43 million. Even if all of these payments were for legitimate reimbursable expenses, which they were not, and Lydia was entitled to receive the maximum mark-up on assets sold to the Fund by early January 2007, which it was not, Lydia should have taken no more than $6.07 million, not $8.16 million. Thus, at a minimum, the Defendants have misappropriated at least $2.09 million of investor funds.

**Defendants' Misrepresentations and Omissions**

16.     In order to induce investors to purchase interests in the Fund, Defendants described the Fund's planned investment activities and supposed associated risks in a Confidential Private Placement Memorandum, dated June 2006 (the "June 2006 PPM"). Defendants stated in the June 2006 PPM that Lydia intended to use the Fund's assets to "purchase life insurance policies in the life settlement after-market on numerous insured individuals of sixty-five (65) years of age or older . . . who have a life expectancy of between two to ten years." The June 2006 PPM also provides that "[u]pon purchasing a policy in a life settlement after-market the [Fund] will be re-assigned all legal rights and responsibilities contained in the policy contract. Therefore, the [Fund] will legally assume all ownership rights to the policy and the death benefit, [and] the responsibility for future premium payments . . . ." The June 2006 PPM provides that the Fund's revenues would be derived from the death benefit of the underlying life insurance policy or gains from the sale of a policy in the secondary life market.

17.     In early August 2006, the Defendants amended the June 2006 PPM and under cover letter signed by Manterfield in early August 2006, reissued a revised private placement memorandum (the "August 2006 PPM") to all existing investors. For the remainder of 2006, the

7

Defendants used the August 2006 PPM to describe the investment activities and risks of the Fund to actual and potential investors. In early January 2007, the Defendants amended the August 2006 PPM and reissued a new private placement memorandum (the "January 2007 PPM"). Except as explicitly stated herein, the June 2006 PPM, the August 2006 PPM, and the January 2007 PPM are virtually identical, and the misrepresentations and omissions found in June 2006 PPM, are also present in the subsequent versions.

18.     In addition to the private placement memorandum, Defendants communicated with investors in a variety of modes. For example, Lydia maintained a password protected website, www.lydiacapital.com, and provided login credentials to all 60+ investors. Lydia also sent login credentials to numerous other potential investors who provided simple background information indicating whether they would be qualified to invest in Lydia. Additionally, Andersen directly provided credentials to potential investors. The website, which was up and running from at least August 2006 through April 13, 2007, contained information related to Lydia, the Fund, Manterfield, and Andersen, and parts of it were updated frequently. The website included a chart showing the Fund's net asset valuation ("NAV") appreciation on a monthly basis starting in July 2006 and continuing through to March 2007. The site also displayed a twenty page Microsoft PowerPoint presentation entitled "Lydia Capital Investment Fund 2006" (the "2006 PowerPoint"), which provided background on the Fund, biographies of Andersen and Manterfield, and directs inquiries to Andersen, listing his phone number and email address.

19.     In addition to the website, Andersen and Lydia provided other Microsoft PowerPoint presentations to investors during the Relevant Period and used those presentations as

8

a guide for oral conversations about the Fund, including one presentation entitled "Lydia Capital Investment Fund 2006/7 – Institutional Partnerships" (the "2006/7 PowerPoint"), and another one entitled "Lydia Capital Investment Fund 2007 – Institutional Partnerships" (the "2007 PowerPoint"). Andersen used the 2006/7 PowerPoint in at least thirty to forty meetings in person with potential investors in the United States, as well as additional meetings, via telephone, with Asian investors during the Relevant Period.

20.    Manterfield and Andersen also produced a newsletter that was sent to investors on a monthly basis by mail and/or email starting with a July 2006 edition and continuing through to March 2007. The newsletter was written by Manterfield and Andersen, with Manterfield doing most of the writing and with Andersen reviewing the material and approving it as chief compliance officer before its publication. Beginning in the fall of 2006, the newsletter was mailed from Singapore to investors in Asia after signoff by Manterfield and Andersen. Manterfield's name appears on the first page of all but one newsletter. The newsletters were sent to investors in the first few weeks of the following month (e.g., the September newsletter was sent out in mid-October).

21.    In addition to the private placement memorandum, PowerPoint presentations, and newsletters described above, Andersen and Manterfield engaged in frequent communications with potential and existing investors, as well as their representatives, via the telephone, email and written letters.

22.    From June 2006 through to February 2007, more than sixty investors purchased limited partnership interests totaling approximately $34 million. The subscriptions continued through the Relevant Period. In March and early April, several investors sent in another $8.7

9

million but it is unclear whether this money was formally accepted for subscription.

23.     During the Relevant Period, Defendants used the previously described modes of communications, as well as others, to sell new partnership interests in the Fund and to maintain and to grow the size of the existing investors' accounts. This securities sales activity, as well as Defendants' role as fiduciary investment advisers, gave rise to a duty on the part of Defendants to disclose to the investors all material information related to the Fund's investment objectives and risks. As described more fully below, however, many of Defendants' communications to investors during the Relevant Period contained material misrepresentation and omissions.

<u>Fabrication & Material Overstatement of NAV Appreciation</u>

24.     The June 2006 PPM states that Lydia will calculate the Fund's indicative NAV on the last day of each calendar month and it will be "the value as of such date of all the <u>assets of the [Fund] . . . less all of the liabilities of the [Fund]</u> . . . ." Defendants told investors that the indicative NAV was subject to biannual audit and confirmation by an actuarial firm ("Actuary A") and the Fund's auditors ("Auditor A"), and that Lydia produced the monthly indicative NAV using portfolio valuation software based on that employed by Actuary A.

25.     In mid-August 2006, Manterfield calculated the Fund's NAV and published the percentage change in the Fund's indicative NAV that purportedly occurred in July 2006. The Defendants falsely reported that the Fund's NAV increased by 1.69% in the month of July. Defendants touted the false information to investors and potential investors by posting it on the Lydia website and included it in the July and later newsletters and other communications. The Defendants knew or recklessly disregarded the misleading nature of the reported July NAV increase because, as described below, they knew that it was based on valuing assets that the Fund

10

did not own.

26.    The reported 1.69% increase in NAV during July 2006 was false and misleading. The Defendants knew that the Fund had not actually purchased any interests in the life insurance policies that were used to calculate July's NAV. Thus, at the end of July, the Fund's assets only included the cash it had received from investors, less expenses. Rather than calculate the Fund's NAV using its actual assets, Defendants improperly included the value of interests in life insurance policies that it hoped to purchase at some future date.

27.    In July 2006, the Defendants were using a broker in California to find interests in life insurance policies ("Broker A"), but by the end of July 2006, no interests had been purchased. Defendants, however, requested that Broker A prepare an analysis of the value of the interests in insurance policies for which Broker A, on behalf of Lydia, had made an oral offer to purchase. Andersen and Manterfield knew that no assets had been purchased by the Fund because they had not signed any agreements or authorized release of funds. The July 31, 2006 report from Broker A shows:

| | |
|---|---|
| Cash at Escrow | $5,063104.78 |
| Cumulative Policy Market Value | $2,813,833.00 |
| Cumulative Policy Face Value | $10,000,000.00 |
| Asset Value for NAV Calculation | $7,876,937.78 |

28.    The Cumulative Policy Market Value in Broker A's July 31, 2006 report purports to be the market value of the interests in the insurance policies with $10,000,000 total face value, taking into account a number of actuarial variables such as the life expectancy of the insureds and the premium payment schedule. The Asset Value for NAV Calculation in Broker A's report

11

was the sum of the Cash at Escrow (the money that will eventually be used to buy interests in policies) and the Cumulative Policy Market Value. The report was inaccurate, however, because neither the Fund nor its indirect agent, Broker A, owned any interests in insurance polices as of July 31, 2006. Manterfield knowingly or reckless used the inaccurate asset valuation from Broker A's July 31, 2006 report to calculate the Fund's NAV and its percentage increase, 1.69%, which the Defendants then published to existing and prospective investors. The 1.69% increase in NAV for July equates to a 20.28% annual return, a number that helped spur additional investment.

29.     Over the next several months, the Defendants followed a similar course of action and had Broker A complete a month-end report that purported to show the asset value of the interests in insurance policies that Broker A had acquired for the Fund. Like the July 31, 2006 report, Broker A's August and September reports, and possibly the October report, counted interests in policies that had not yet been purchased by the Fund or its indirect agent, and thus, the resulting asset values were substantially higher than they actually should have been.

30.     Broker A's August 31, 2006 report shows interests in insurance policies with a face value of $36,500,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values totaling no more than $32,500,000 (and likely less). Using this false report, Manterfield calculated an increase in NAV for August of 1.44%, which the Defendants then published to investors on Lydia's website and newsletter. Similarly, Broker A's September 30, 2006 report shows interests in insurance policies with a face value of $36,500,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values totaling no more than $35,250,000 (and likely less). Using

12

this false report, Manterfield calculated an increase in NAV for September of 1.53%, which the Defendants then published to investors on Lydia's website and newsletter.

31.    In October 2006, the Defendants entered into a relationship with a new broker based in Indiana ("Broker B"). Broker B took over the role of Broker A and went about finding interests in insurance policies for the Fund. The Defendants continued the practice they had established with Broker A, and had Broker B prepare a month end report starting in at least December 2006 that purported to calculate the asset value associated with interests in insurance policies that Broker B had acquired on behalf of the Fund. As was the situation with Broker A, the monthly reports from Broker B were incorrect in that they valued interests in insurance polices that had not yet been purchased.

32.    Broker B's December 31, 2006 report shows interests in insurance policies with a face value of $77,000,000, when at most, Broker B had used the Fund's assets to obtain interests in policies with face values totaling no more than $12,500,000. Using this false report, Manterfield calculated an increase in NAV for December 2006 of 1.66%, which the Defendants then published to investors on Lydia's website and newsletter. Broker B's January 31, 2007 report shows interests in insurance policies with a face value of $102,000,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values totaling no more than $49,150,000 (and likely less). Using this false report, Manterfield calculated an increase in NAV for January of 1.48% and then the Defendants published this information to investors on Lydia's website and newsletter. Broker B's February 28, 2007 report shows interests in insurance policies with a face value of $142,000,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values

13

EXHIBIT E

65

totaling no more than $89,150,000 (and likely less), through the end of the month of February, 2007. Using this false report, Manterfield calculated an increase in NAV for February of 1.68%, which the Defendants then published to investors on Lydia's website and newsletter.

<u>False Business Activities, Phantom Investors and Terminated Relationships</u>

33.     Defendants published materially false information about Lydia's business activities, the existence of investors from countries other than Taiwan, and other matters so as to falsely legitimize themselves to the Fund's investors.

34.     Lydia's July 2006 newsletter, prepared by Manterfield and reviewed prior to publication by Andersen, falsely stated that "[n]ew investors from Mexico, Austria, Israel, and the USA are expected to boost our purchasing power and increase our profit margin." Defendants knew, however, that that the only investors in the Fund were from Taiwan.

35.     Lydia's September 2006 newsletter, also prepared by Manterfield and reviewed by Andersen prior to publication, falsely stated that Lydia was opening new offices in Mexico and Singapore, when in fact the Defendants knew that the firm had no such offices. The September newsletter also falsely stated that Lydia was "already welcoming new investors from South America, together from institutional investments from Funds-of-Funds in Europe . . . ." In fact, Defendants knew that throughout the Fund's existence, all of its investors were from Taiwan.

36.     On October 24, 2006, Manterfield emailed a broker selling Fund interests in Taiwan and falsely stated that Lydia has been approached by a "Swedish Financial Institution" with a request to help package a structured note for their clients. Later that day, Manterfield emailed the same broker to say that a "private Banking Organization in Sweden has agreed to

14

EXHIBIT E

66

'brand' a note linked 100% to Lydia Fund. Nordic." Manterfield identified the firm as Nordic Mutual. As described below, however, Nordic Mutual was not a real or separate entity, but rather a creation of Manterfield and Andersen with a website and no real business.

37.     Lydia's November 2006 newsletter contained further falsehoods about Nordic Mutual, in that it stated that Lydia had "established links with a small Private Institution based in Scandinavia. Nordic Mutual is similar in structure to the US "Savings & Loan or Credit Union. . . . Offering a range of financial services to its private members . . . Nordic Mutual has expressed a desire to offer a 5 year Structure Note" tied to the Fund. Manterfield and Andersen knew that Nordic Mutual had no separate existence and they knew this because they bought the shell.

38.     Lydia's December 2006 newsletter made many other false and misleading statements about the relationship between Lydia and Nordic Mutual, noting in particular that the purported structured note deal has been launched.

39.     Nordic Mutual, however, was invented out of whole cloth by Manterfield and Andersen. On or about October 24, 2006, Lydia purchased the shell of a Swedish credit union from a company in Panama, Overseas Clearing Corporation, that specialized in creating overseas financial institutions. Andersen and Manterfield bought "Nordic Mutual Savings and Loan" for $38,000 in a package that included a credit union registration, certificates and bylaws in Swedish and English, and other bits and pieces of veneer designed to make it look like a real and substantial company. In order to complete the fraudulent scheme, a website was created for Nordic Mutual that purported to show a functioning financial institution offering banking products to private clients, including a structured note tied to a hedge fund in the life settlement industry. In fact, Nordic Mutual was and remains nothing but a virtual company with no staff or

15

physical location.

40.     On October 26, 2006, Manterfield wrote a letter and sent it via email to a Taiwanese corporate investor that had already made a $2 million investment in the Fund. Manterfield wrote to the investor to address a concern about redemption liquidity. Manterfield misled the investor by stating that Lydia had "negotiated credit-line collateralized financing with our colleagues at KBC Bank amongst others, and this will allow us to raise 90% of the market value of policies at 48 hours notice." In fact, Manterfield knew that Lydia had no such relationship with KBC Bank. Manterfield also knew that Lydia had no such relationship with any other institution which was willing to extend Lydia credit based on the value of the Fund's interests in insurance polices. After receiving Manterfield's misrepresentations, the corporate investor made and additional $1 million investment on November 2, 2006.

41.     In addition to lying about nonexistent business relationships, the Defendants knowingly or recklessly omitted telling investors about key vendor relationships that were terminated under less than favorable terms. In early February, Actuary A, a firm that had been hired by Lydia to audit its valuation of the Fund's assets, declined to continue engagement upon learning of Manterfield's criminal troubles in England. The Defendants did not disclose to investors the reason why the relationship was terminated, and instead noted in the February 2007 newsletter, published in early March 2007, that there had been several delays with Actuary A's work and serious failures to perform that led to the end of the relationship. This omission was material because the Defendants, basically since it first started soliciting funds, had been touting the relationship with the Actuary A, as well as the use of software based on its methodology to support its own calculations of NAV.

16

**EXHIBIT E**

**68**

42.    Shortly after Manterfield's January 2007 arrest, a number of financial institutions at which Lydia and the Fund had accounts terminated their relationships based on suspicious money flows and knowledge of Manterfield's arrest and/or criminal record. This forced the Defendants to seek out new banking relationships. Manterfield, Andersen and Lydia did not disclose to the Fund's investors the reason why the relationships were ended nor did they disclose the asset freeze, which had the potential to bring activities at the Fund to a halt. Defendants chose instead in their February 2007 newsletter to misrepresent the nature of the banking changes as a decision undertaken to improve and streamline the firms' processes.

43.    In late February and/or early March 2007, the Fund's auditors, Auditor A, met with Andersen and told him that, based on their review of the Fund's activities and the assets it held, that it could only provide a report with a disclaimer, which Auditor A forwarded to Andersen. The disclaimer said that the Fund was not "audited" and no "opinion" was provided by Auditor A. Mr. Andersen told Auditor A that the report was not acceptable. Auditor A responded by saying that he (Lydia) needed to find another auditor. Manterfield sent an e-mail to Auditor A afterwards noting his disappointment. Once again, Defendants decided not to disclose this material information to investors.

**Defendants hid Manterfield's Criminal History and Asset Freeze**

44.    Defendants' failure to disclose Manterfield's significant criminal history, as well as the February 2007 order freezing all of Manterfield's assets that he controlled directly and indirectly, which was issued by an English court in connection with a money laundering inquiry, was a material omission and a breach of their fiduciary duty to investors. Likewise, Lydia's Form ADV, which was publicly available to investors online, contained material

. 17

EXHIBIT E

69

misrepresentations in Item 11. In response to questions in Item 11 of the Form ADV about whether any advisory affiliate, which includes Manterfield, had been convicted or charged with any felony, or convicted or charged with a misdemeanor involving fraud, wrongful taking of property or conspiracy to commit the same, Andersen checked the "no" boxes. Manterfield, Andersen, and Lydia, likewise failed to amend and modify Item 11 as new information developed.

45.     On or about June 12, 1992, Manterfield was convicted at the Sheffield Crown Court in South Yorkshire, England on one charge of obtaining property by deception, a felony for which he could have been sentenced to at least one year imprisonment, and was sentenced to 180 hours of community service.

46.     On or about March 25, 1996, Manterfield was convicted in the Leeds Crown Court in West Yorkshire, England on four charges of conspiracy to defraud, a felony for which he could have been sentenced to at least one year imprisonment, and was given a sentence of incarceration for twelve months that was suspended for two years.

47.     On or about November 29, 1999, Manterfield was convicted in the Sheffield Magistrates Court in South Yorkshire, England on three charges of shoplifting and was given a twelve month conditional discharge.

48.     On or about December 5, 2006, Manterfield was convicted in the South East Suffolk Magistrates Court in Ipswich, England on one charge of handling stolen goods, a felony for which he could have been sentenced to at least one year imprisonment, and was fined £200. Manterfield was initially arrested on May 16, 2000 and was charged in November 2000 with three charges of theft and one charge of handling stolen goods. Manterfield was released on bail

18

pending his court date.  However, before the court date, Manterfield fled England and did not

return for several years, thus violating his conditions of bail.

49.    On or about January 26, 2007, Manterfield was arrested in England on suspicion

of acquiring criminal property, a potential felony charge.  On February 5, 2007, in connection

with this inquiry, an English court froze all assets that Manterfield controlled directly or

indirectly, but allowed Manterfield, to the extent that the was not imprison, to spend up to £300 a

week towards his ordinary living expenses.  Because of his ownership of Lydia, the English

freeze order covers all accounts for Lydia and the Fund.  On March 26, the English court

continued the February 5, 2007 order leaving the asset freeze in place.

50.    Throughout January, February and March 2007, the Defendants failed to make

any substantive disclosure to investors as to the many negative events suffered by the firm and

its principal.  Instead the Defendants continued through the use of newsletters and other

communications to portray the firm and the Fund as prosperous and growing, all the while taking

in substantial new and additional subscriptions from investors in Taiwan.

### Defendants Failed to Disclose Real and Serious Risks

#### False Bonding & Reinsurance Claims

51.    The June 2006 PPM states that the "longevity risk" – the risk that the underlying

insured will outlive his or her life expectancy – was one of the most important determiners as to

the return that the Fund can expect on any given policy.  The problem caused by an insured

living past his or her life expectancy date is that receipt of the death benefit is delayed and

additional premiums may be needed to keep the policy in force – meaning that the Fund needs to

expend additional capital resulting in a lower return on its investment.

19

52.    The Defendants falsely told investors in the June 2006 PPM that they intended to manage the longevity risk through, among other things, the use of bonding, and reinsurance. "Bonding" is a practice whereby the Fund pays a third party for a bond such that if the insured lives a specified period beyond his or her life expectancy, the bonding company purchases the bonded policy from the Fund at face value. "Reinsurance" is a practice whereby the Fund pays a third party and the third party agrees that if the insured lives a specified time past his or her life expectancy, the third party will pay all premiums to keep the policy in force. The Defendants knowingly or recklessly omitted to tell actual and prospective investors, however, that the Fund never purchased bonding or reinsurance, and in fact never discovered any company offering such products.

53.    The 2006 PowerPoint, which was posted on Lydia's website and made available to the hundreds of investors and potential investors that received website login credentials from Andersen and Manterfield, went further than the June 2006 PPM in misrepresenting how the Defendants intend to deal with the longevity risk. Page 3 of the 2006 PowerPoint stated that the Fund had obtained an "AAA-Rated Re-Insurance Package," and on page 12, investors are told, "[o]ur bonding solution carries a back-up guarantee from an AAA-Rated European Government." Those statements are simple falsehoods – the Fund had not purchased any reinsurance or bonds. Page 10 of the 2006 PowerPoint also fraudulently states:

> Our primary concern is longevity risk and we manage that risk in four ways [including]:
> 1.  Bonding. By purchasing a Settlement Bond we can effectively build-in a guaranteed maturity date. If the insured remains alive after this date the Bond issuer pays out the full value of the policy. . . .
> 3.  Re-insurance. This addition covers the payment of future premiums for the life of the insured, after the Life Expectancy date passes.

20

EXHIBIT E

72

54.    A fact sheet prepared by Lydia and distributed to investors in Taiwan during the Relevant Period contained similar falsehoods: "Margins are created by the deep initial discounts . . . creating an inherent growth rate, and the bulk of that rate is locked in by the purchase of Extended Longevity Risk Mitigation Insurance, which gives us a guaranteed worst-case maturity payout. [O]ur Extended Longevity Risk Mitigation Insurance with an AAA-Rated European Government Guarantee, cannot be matched anywhere."

### Suicide Exclusion Risk

55.    The June 2006 PPM states that one of the "[k]eys to assuring the integrity and value of a life settlement transaction include[s] . . . assuring there is no suicide exclusion" in the insurance policies in which the Fund acquires an interest. "Suicide exclusions" are provisions in life insurance policies which state that if the insured commits suicide within two years of the issuance of the policy (the "contestable period"), the insurance company will not pay any death benefit and instead will only return any premiums paid. Such an occurrence, because of the Fund's substantial cost to acquire an interest in an insurance policy over and above the premiums it must also pay, would be a material negative event.

56.    Defendants, however, knowingly or recklessly omitted to tell investors that such provisions exist in every life insurance policy in which the Fund acquired an interest and in fact that no insurance companies sell life insurance without suicide exclusion clauses. Thus, Defendants knowingly or recklessly misled investors into thinking that they had a strategy to limit the risk posed by a suicide. The suicide risk was especially relevant to the investors in the Fund because all of the insurance policies in which the Fund owned an interest were still in the contestable period, and thus susceptible to losing the death benefit if suicide occurred.

21

EXHIBIT E

73

**Premium Payment Risk**

57.    In order to maintain the value of the Fund's interests in various life insurance policies, the premiums on the polices needed to continue to be paid or the policies will lapse and become worthless. The 2006/07 PowerPoint, falsely stated that the Defendants "avoid this risk by pre-paying premium payments up to and beyond the point at which we intend to package and re-sell a given portfolio." *This misrepresentation was repeated on page 10 of the 2007 PowerPoint.* The June 2006 PPM also falsely stated that "[f]uture premiums will be escrowed . . . ." to avoid the premium payment risk.

58.    Contrary to the above, however, the Defendants had not prepaid premiums on all insurance policies beyond the point at which they intend re-sell (i.e. beyond the end of the contestable period); in fact, the premiums on some policies were being paid on a monthly or quarterly basis. *Defendants' knew that the above statements were false because they tracked and authorized premium payments as they became due.* *Defendants also did not undertake any systematic attempt at escrowing necessary premiums, which will cost several million dollars on an annual basis.* It appears as if Defendants were counting on new subscriptions for cash to pay the debt, rather than planning to pay for premiums in advance.

**Contestability Risk**

59.    Defendants focused the Fund on purchasing interests derivative of insurance polices that were still in the contestable period. The Defendants, however, knowingly or recklessly *failed to adequately describe the special risks inherent in such an investment strategy.* The Defendants instead tailored their disclosures on what they saw as the positive aspects that may come from the heightened returns associated with the deep discounts that the market

22

EXHIBIT E

74

imposed on the sale price of interests in contestable policies. The market imposes these discounts, however, because of the additional material risks that the Defendants failed to disclose to the Fund's investors.

60. The significance of buying interests in policies that are still in the contestable period was that if an insured dies during this timeframe, the insurance company can investigate the matter and if it finds fraud in connection with the purchase of the policy, refuse to pay any death benefit. Rescission was a possibility if the insured makes misrepresentations or omissions on his or her insurance application related to, among other things, the insured's health, financial status, the existence of pending or granted insurance policies, or the intent to sell an interest in the policy. Depending on the nature of the fraud, an insurance company has two options. First it can seek rescission of the policy, at which point all that the Fund would be entitled to receive would be a return of premiums paid, with some small amount of interest. If the fraud is more severe, the insurance company can seek to have the policy declared void, at which point the insurer can obtain a setoff against paid premiums for damages. Either way, given the substantial acquisition costs that the Fund incured in obtaining an interest in an insurance policy, a simple return of premiums, even with interest, would result in a net loss for the Fund. Moreover, any delay and expense incurred in addressing concerns raised during an insurance company's review would also lower the Fund's return. The Defendants knew of these risks but failed to fully disclose them to investors, simply stating in the June 2006 PPM, without an explanation, that selling interests in contestable policies was a "riskier practice" than trading in non-contestable policies.

61. Defendants also understood that the issue of contestability was not a remote one

23

for the Fund. In the 2007 PowerPoint, the Defendants stated that "within the two year contestable period a percentage of the polices (around 27%) will actually mature," (i.e. the insured will die). The Defendants painted this as a positive fact for the Fund because the early maturity generates a stronger return. Defendants failed to disclose to investors, however, that motivated insurance companies will work to try and avoid paying death benefits on contestable polices because they represent a significant loss for the insurance companies.

62.     The Defendants noted in the June 2006 PPM that there has been fraud in the life settlement industry, and stated that there have been a "number of companies [in the life settlement industry] considered less than reputable." One of fraudulent practices described by the Defendants in the June 2006 PPM was "clean sheeting," a colloquial term in the life settlement industry related to the practice of an insured withholding negative information about his or her health from an insurance company. Defendants failed to disclose to investors, however, how the Fund could suffer if it found itself dealing with a non-reputable firm or insurance broker that was supplying "clean sheet" policies.

63.     It is clear from the variety of purchase-related contracts that the Defendants and their agents used during the Relevant Period to memorialize the Fund's interests in the insurance policies that the Defendants' knew of the risks inherent in contestable policies. The contracts required representations that were aimed at helping to avoid issues that could lead to rescission during the contestable period. For example, the Assignment of Beneficial Interest Agreements used in most if not all of these transactions, contained the following representation:

> [N]o statement, representation, warranty or information made or provided by Assignor or the Insured in any application, worksheet or supplemental document made or provided to the Insurer for the Policy, or otherwise made or provided by Assignor or the Insured to the Insurer, contained any untrue statement of fact, or

24

**EXHIBIT E**

76

omitted to state any fact necessary to make such statement, representation or warranty not misleading, true and complete in all respects;

[A]ll personal, medical and financial information provided with respect to the Insured in connection with acquisition of the Policy and in connection with the sale of the Interest by Assignor to Assignee (including, without limitation, all medical records and other information provided to the medical or life expectancy underwriters) are true, correct and complete and do not fail to state a fact necessary to make such information not misleading.

64.    Defendants knew or recklessly disregarded the fact that rescission by reason of fraud in the procurement of insurance was a live issue for the Fund. In at least five instances, described in detail in paragraphs 65 and 66, the insurance applications and related documents of five insureds, all of which were in the possession of the Defendants, presented a strong possibility of fraud that could lead to rescission. The five insurance policies in question had a face value of $16.5 million, or just over ten percent of the total face value of all of the policies underlying the assets of the Fund.

65.    In four instances (a $1.5 million policy issued on CV, a $5 million policy issued on HG, a $2 million policy issued on RW, and a $3 million policy issued on RB) the insureds all answered "no" to the question on their applications asking whether they ever discussed the possible sale or assignment of their policy in a life settlement transaction. The Defendants possessed strong circumstantial evidence in documents that would or should have been reviewed as part of Defendants' deal diligence, indicating that the insureds' representations were incorrect. First, all of the insureds obtained independent life expectancy evaluations prior to applying for insurance – CV, HG, and RB did so within two to five weeks of submitting their applications. An independent life expectancy analysis was a critical piece of data that Defendants relied upon in pricing a life settlement transaction. On information and belief, such analyses were not

25

typically obtained by individuals just seeking insurance coverage who were not also evaluating selling their policy in the secondary market. Moreover, CV, HG, RW and RB sold interests in their policies to the Fund's indirect agents within approximately one to five weeks after applying for coverage. Obtaining a life expectancy analysis before applying for insurance and then selling an interest in the policy within weeks of issuance together offer strong evidence that CV, HG, RW, and RB lied on their insurance applications in saying that they had not discussed such an eventuality.

66.   The fifth policy at risk of rescission was a $5 million policy issued on AL.  AL responded in the negative to a question on the application for the $5 million policy asking whether he had any other life insurance in force or applied for.  The Fund purchased interests in two life insurance polices issued on AL, the $5 million policy that he applied for on March 2, 2007, and a $9 million policy from another insurance company that he applied for on February 27, 2007.  Thus, it appears as if AL misrepresented the truth in his application for the $5 million policy.  Defendants possessed both of AL's applications and knew that the two polices were issued close in time.

67.   Based on straightforward information which Defendants possessed, and which they had a reason to review as part of their deal diligence and in fulfillment of the their fiduciary duties to evaluate the assets that the Fund purchased, if CV, HG, RW, RB, or AL were to die during the contestability period, the insurance company's inquiry could have lead to rescission efforts.  Defendants, however, knowingly or recklessly failed to make any disclosure to investors associated with these material risks.

68.   The unique risks posed by buy interests in contestable polices involve exposure to

another illicit practice called "wet inking." "Wet inking" involves the purchase of an insurance policy purely for the purpose of selling it in a life settlement transaction immediately after issuance, or while the ink on the policy is still "wet." Insurance companies will not sell insurance policies to individuals for purposes of resale to strangers, nor will courts, for long standing public policy reasons, allow such insurance contracts to be validly enforced. Such situations run afoul of a concept in insurance law know as "insurable interest" which requires that, at the time a policy is issued, the owner of the policy (i.e. the beneficiary) have an interest in seeing the insured survive rather than immediately die.

69.     Defendants, by focusing on contestable policies issued on high net worth individuals over the age of seventy-five, participated in a process whereby it was probable that individuals would be obtaining life insurance for the purpose of immediate sale into the secondary market, and thereby giving rise to a risk that the policies would be subject to a challenge on insurable interest grounds. Defendants were aware of the "wet ink" issue. For example, the Defendants' agents often required insureds to sign consents and undertakings that included the following language:

> I certify that no formal or informal agreement, arrangement, understanding to sell or assign ownership of any beneficial interest in the Policies was arranged prior to the Policies being placed in force.

70.     While Defendants were aware of the risk posed by "wet ink" policies, they knowingly or recklessly omitted to describe the risk to investors. Moreover, a review of the timing of key events related to policies underlying the Fund pointed to a strong possibility that many of the policies may in fact have been procured by "wet inking," and thus, subject to a possible insurable interest challenge if the insured died during the contestable period. For

27

example, interests in fourteen of the thirty-three polices in the Fund, with a total face value of

$68.4 million, were transferred to Lydia's agent less than four weeks after the policies were

issued. Eight of these fourteen transfers happened less than ten days after issuance. Once again,

Defendants knowingly or recklessly failed to make any disclosure to investors associated with

these material risks.

*Defendants Misstated the Nature of Its Investment Process and the Underlying Assets*

71.     Throughout the June 2006 PPM and of the various PowerPoint presentations,

newsletters, and other communications, Defendants represented that they utilized the services of

various escrow agents in order to provide false assurance to investors that the Defendants will

would not have an opportunity to misappropriate investors' funds. For example, the 2006

PowerPoint, specifically states:

> All investments are wired directly to the Fund's US-Onshore Bank Account at JP
> Morgan. The sole signatories to this account are our administrators, [DL]. They
> in turn wire the deposit to escrow with Morgan Stanley, and only when policies
> have been received by them with details amended to reflect the [Fund] as the new
> and sole beneficiary, is any capital released by Morgan Stanley. *This structure
> has been devised to deliver peace of mind and allay any fears regarding potential
> misappropriation of funds.*

72.     While investors' funds were initially placed into an account over which the

Fund's administrator had sole signatory power, Manterfield and Andersen then had the funds

moved to other accounts over which they had direct or indirect control. For example,

Manterfield and Andersen were signatories on the Morgan Stanley escrow account described in

the 2006 PowerPoint. Thus, once the investors' money was transferred into the Morgan Stanley

account, Manterfield simply withdrew funds as he saw fit. Moreover, in addition to the Morgan

Stanley account, Defendants used several other "escrow" accounts, to which they likewise

·28.

**EXHIBIT E**

80

enjoyed easy access though direct or indirect control of the various escrow agents. Through this process, Defendants were able to misappropriate millions of investors' funds.

73.     Defendants also made knowing or reckless material misrepresentations during the Relevant Period about the assets that they were buying for the Fund. For example, a one page fact sheet that Lydia distributed to investors in Asia during the Relevant Period indicated that the Fund owned interests in life insurance policies issued by highly rated and commonly known insurance companies, New York Life, Metropolitan Life, and Mass Mutual, when in fact, the Fund never owned any interests in policies issued by these companies. Defendants knew that the fact sheet was false and misleading because they approved or at least ratified all of the transactions in which interests in insurance polices were purchased, and thus, knew the names of the companies involved.

74.     Defendants also knowingly or recklessly provided materially false information to investors with respect to the manner in which they selected life insurance interests for the Fund. The June 2006 PPM, the 2006/7 PowerPoint, as well as the July and August 2006 newsletters, contain representations about the Fund's purported "Policy Selection Criteria," including the following requirements: (1) expectancy reports from at least two firms completed within ninety days of closing; (2) annual premium rates set at no more than 5% of face value; and, (3) life expectancies of between five and ten years with a preference towards expectancies of between five to nine years.

75.     Defendants knowingly or recklessly disregarded the fact that these selection guidelines were rarely used. In fact, material variations from the published parameters were tolerated without disclosure to investors. For example, less than half of the insureds had two life

29

expectancy analyses completed prior to closing and, in most instances, the reports were completed more than ninety days before closing (i.e. they were stale). Defendants also knowingly or recklessly disregarded the fact that more than twenty of the thirty-three policies in which the Fund held interests have annual premiums that are greater than 5% of face value. Similarly, there were more than nine policies, with a combined face value of greater than $40 million, where the insured's life expectancy was estimated at greater than 10 years. Both of these issues, higher premiums and longer life expectancies, created a risk of lower than projected returns, and should have been disclosed to investors.

## FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

76.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-75 of the Amended Complaint as if set forth fully herein.

77.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

78.     As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

30

EXHIBIT E

82

## SECOND CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act)

79.    The Commission repeats and incorporates by reference the above allegations in of the Amended Complaint as if set forth fully herein.

80.    By reason of the foregoing, Defendants, directly or indirectly, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the purchaser of securities in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

81.    As a result, Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act.

## THIRD CLAIM FOR RELIEF
### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

82.    The Commission repeats and incorporates by reference the above allegations in of the Amended Complaint as if set forth fully herein.

83.    Defendants were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

84.    Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly: (i) have

31

EXHIBIT E

83

employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are

engaging in transactions, practices, or courses of business which operate as a fraud or deceit

upon a client or prospective client.

85.     As a result, Defendants have violated and, unless enjoined, will continue to

violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a preliminary injunction, order freezing assets and order for other equitable

relief in the form submitted with the Commission's motion;

B.     Enter a permanent injunction restraining Defendants and each of their agents,

servants, employees and attorneys and those persons in active concert or participation with them

who receive actual notice of the injunction by personal service or otherwise, including facsimile

transmission or overnight delivery service, from directly or indirectly engaging in the conduct

described above, or in conduct of similar purport and effect, in violation of:

1.     Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. '240.10b-5];

2.     Section 17(a) of the Securities Act [15 U.S.C. § 17q(a)];

3.     Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)];

C.     Require Defendants to disgorge their ill-gotten gains and unjust enrichment, plus

pre-judgment interest, with said monies to be distributed in accordance with a plan of

distribution to be ordered by the Court;

32

D.    Order Defendants to pay an appropriate civil monetary penalty pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

E.    Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

F.    Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Plaintiff hereby requests that this matter be tried before a jury.

/s/ R. Daniel O'Connor

R. Daniel O'Connor (BBO #634207)
oconnord@sec.gov
Silvestre A. Fontes (BBO #627971)
fontess@sec.gov
Martin F. Healey (BBO #227550)
healeym@sec.gov
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street
Boston, MA  02110
(617) 573-8991 (Fontes)
(617) 573-8952 (Healey)
(617) 573-8979 (O'Connor)
(617) 573-4590  fax

May 1, 2007

33

EXHIBIT E

85

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

## # 149115    — KD

## March 26, 2008
## 12:44:31

## Civ Fil Non-Pris
USAO #.: 08CV0569
Judge..: BARRY T MOSKOWITZ
Amount.:                    $350.00 CK
Check#.: BC 67658

## Total—>  $350.00

FROM: CIVIL FILING
      XA EQUITABLE LIFE INS CO V.
      MORAN, ET AL

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| XA EQUITABLE LIFE INSURANCE COMPANY | H. THOMAS MORAN, II, Ct-Apptd Recvr of LYDIA CAPITAL LLC & DAWSON & OZANNE, Trustee-A. Fischbach Irrev Trust |

**(b)** County of Residence of First Listed Plaintiff    New York, NY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Oklahoma
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
DRINKER BIDDLE & REATH LLP, 50 Fremont St., 20th Floor, San Francisco, CA 94105, 415-591-7500

Attorneys (If Known)

'08 CV 0569 BTM BLM

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | | ☐ 892 Economic Stabilization Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 893 Environmental Matters |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | ☐ 894 Energy Allocation Act |
| | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | ☐ 895 Freedom of Information Act |
| | | ☐ 555 Prison Condition | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| | | | | ☐ 950 Constitutionality of State Statutes |

**PERSONAL INJURY** (second column)
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC § 2201

Brief description of cause:
Declaratory Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE                          DOCKET NUMBER

DATE   25 March 2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  149115    AMOUNT  $350    APPLYING IFP  no  3/24/08    JUDGE                MAG. JUDGE